(No. 21338.—▮▮▮▮▮▮▮)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HARRY GIBBS, Plaintiff in Error.

*Opinion filed June 24, 1932.*

R. E. Smith, for plaintiff in error.

Oscar E. Carlstrom, Attorney General, Marion M. Hart, State's Attorney, J. J. Neiger, and R. E. Hickman, (T. G. Lewis, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Harry Gibbs (referred to as defendant) was convicted in the circuit court of Franklin county of murder and his punishment was fixed at forty-five years in the penitentiary. The cause is in this court on writ of error.

Gibbs resided in West City, a small village adjoining the city of Benton. His dwelling house was south of and about twenty-five or thirty feet from a highway running east and west. Pauline, his wife, and their four-year-old child resided with him. The family was frequently visited by his wife's sister, Audrey Ray. There were other occupied houses across the road. On the east side of defendant's house steps led from the back porch to the ground. The distance from the back steps to the northeast corner of the house was approximately seventeen feet. Shortly before five o'clock P. M. on December 21, 1930, Donald Wilcox, a young man about twenty-nine years old, residing in the vicinity, parked his car off the hard road in front of defendant's house, left the engine running and entered the premises. Within a few minutes thereafter the neighbors heard a shot fired and found the dead body of Wilcox lying on the ground near the northeast corner of the house. The body was on its right side, with the head to the northwest and the feet to the southeast. Both of the hands of the deceased were in the front pockets of his pants. He had been killed by a shot fired from a shot-gun. The wound was on the left side of the neck, severing both the jugular vein and the spinal cord. No weapon of any kind was found on or about the body. Deceased had a small unopened pocket knife in his pants pocket.

Shortly after the body was found defendant was arrested at the home of his brother, Jim Gibbs. According to the testimony of a number of witnesses for the prosecution defendant was asked, shortly after his arrest, by one of the officers why he had killed Wilcox. Defendant re-

plied he had done so because Wilcox was coming toward him with an ax. Defendant was then taken to his home. He went into the house and procured a shot-gun which he said he had used to kill Wilcox and gave it to the officers. At that time he showed the officers the place where he stood when he shot Wilcox. He fixed it about four or five feet east of the steps at the back porch and approximately seventeen feet south of where the body was found. He was then taken to the jail and there repeated the statement that he killed Wilcox because the latter was coming at him with an ax over his shoulder. He further stated that at the time he fired the shot he was not afraid of Wilcox but was a little "leery" of him; that he was not afraid of his injuring his wife, his child, his sister-in-law or any other member of his family; that it was light enough to see Wilcox and he could plainly see the ax, and that while he had been drinking he was not too drunk to know what he was doing.

The testimony on the part of defendant shows that in the afternoon of the day of the killing defendant and his family were away from home; that his wife and Audrey Ray returned a few minutes after four o'clock; that Wilcox stopped at the house and knocked at the front door, but the two women concealed themselves in the pantry and did not answer his knock; that he left, and that about 4:30 defendant came home. The women told him about their hiding from Wilcox. About five o'clock Wilcox returned to defendant's home. Defendant was then lying on a day-bed, with his shoes off. The testimony further shows that the sister-in-law, Miss Ray, went to the door and told Wilcox defendant did not want him there and he had better leave or there would be trouble; that Wilcox replied, "To hell with Harry," but did not leave; that thereupon defendant's wife, at his request, also importuned Wilcox to leave, but he refused to go; that defendant went out on the back porch and requested Wilcox to leave, as he did not want him there and did not want any trouble with him; that defendant

went back into the house, secured his shot-gun, loaded it and went out the second time; that Wilcox was then standing about four feet northeast of the house, where he was killed, and according to defendant's admission the distance between them had increased after he came out with the gun and before he fired the shot.

Defendant testified that when he first went out of the house Wilcox had an ax and said, "God damn you, I'm going to kill you;" that he (defendant) said, "All right," and went into the house, got the gun, went out again and told Wilcox to go away; that Wilcox repeated his remark and ran his hand into his pocket; that defendant then fired; that after he fired he went into the house, set the gun down in the corner and put on his shoes; that he went to the house of Ellis Wilson and Dugan Moore and to his brother Jim's house. He admitted that he told the officers he killed Wilcox because he came at him with an ax, but explained that when he made the statement the State's attorney charged him with lying, and he replied, "Maybe I am." A witness for the prosecution testified that shortly after the killing defendant went to the home of Tony Miller and asked him to get George Lockhart, a cab driver, saying that he had shot a man and had to get out "hot." Defendant's version of this conversation is that he asked Miller to procure an automobile for him to go out to his father-in-law's.

Wilcox had been acquainted with defendant's wife and sister-in-law for many years and had visited the home of defendant. Audrey Ray, the sister-in-law, testified that on July 4 prior to the killing Wilcox put his hand on Pauline's shoulder and asked her to go to a dance with him that night; that defendant ordered Wilcox to leave; that in the early part of September, and again in October, Wilcox came to the house and defendant ordered him to leave and stay away; that when Wilcox was ordered away on July 4 he said it was a good thing Gibbs did not start anything, as he (Wilcox) had a gun and would have used it, and that she

told defendant about it. Defendant testified he heard Wilcox try to make the date with his wife. Miss Ray also testified that defendant told Wilcox on the day of the homicide that he had better leave as he did not want any trouble with him; that thereupon Wilcox picked up an ax that was lying by the well and said, "God damn you, I am going to kill you;" that defendant then went into the house and came out with a gun; that when defendant went into the house Wilcox dropped the ax and defendant's wife picked it up and started to the south end of the house with it; that Wilcox walked toward the northeast corner of the house, and as defendant came down the steps Miss Ray walked into the house and heard Wilcox repeat his threat and heard the shot fired. She was taken into custody at the time defendant was arrested and questioned by the officers. She told them Wilcox came to the house to talk to her about his sweetheart, Pearl Hunt, but on the trial she said he came to see defendant's wife, Pauline; that the story she told at the jail was not true and what she had said about Pearl Hunt was told to protect her sister. At the time she was questioned by the officers she omitted any statement about her sister picking up the ax. On the evening of the killing the sheriff found the ax at the rear of the house, lying on a coal pile at the place where defendant said he left it that morning.

The grounds urged for reversal are that the court improperly admitted evidence relating to statements made by defendant when he was questioned by the officers in the county jail, and also that the court gave improper instructions on behalf of the prosecution and refused proper instructions offered by the defendant. The defendant does not complain of the statements made by him in the conversations with the officers before he was taken to the county jail. He insists that his statements at the jail were taken in the presence of five officers, shortly after the killing and while he was still under excitement from the difficulty;

that he had only a meager education, having left school while he was in the third grade; that he had been drinking and had no opportunity to consult a lawyer or any of his friends, and that the statements were thus obtained by unfair means and were not admissible in evidence against him. The statements made by him were exculpatory admissions and did not amount to a confession of guilt. They amounted to a claim of self-defense. An acknowledgment of facts which may tend to establish guilt is not a confession but only an incriminating admission, which may be made without any intention of confessing guilt. The statements being exculpatory, preliminary proof of their voluntary character was unnecessary. (*People* v. *Okopske,* 321 Ill. 32; *People* v. *Kircher,* 309 id. 500.) However, the record shows that his statements were not made in response to any promise, threat or abuse and were wholly voluntary. The evidence shows that he was advised that he was not obligated to say anything unless he desired, but that if he did make a statement he was admonished to tell the truth.

It is further objected that the testimony as to defendant's statements was improper because they were not reduced to writing and were therefore uncertain. The court instructed the jury that verbal statements or admissions should be received with great caution, as they are subject to much imperfection and mistake. There is no rule of law which requires such statements to be taken in writing in order to be admissible in evidence. Defendant insists that the court should have instructed the jury that such parts of his statements as were in his favor should be taken as true until shown to be false by competent evidence beyond all reasonable doubt. Even if such a rule prevails no such instruction was requested, and defendant is therefore in no position to complain that it was not given. *People* v. *Rozanski,* 268 Ill. 607.

The court instructed the jury that as a matter of law the words "malice aforethought" do not necessarily imply

the lapse of a considerable time between the malicious intent to take life and the actual execution of that intent; that whether the design to effect death was formed on the instant or had been previously entertained is immaterial, for the malicious killing, if proven by the evidence beyond a reasonable doubt, in either case is murder under the laws of this State, provided the jury further believes from the evidence, beyond a reasonable doubt, that no circumstances exist excusing or justifying the act or mitigating it so as to make it manslaughter. An instruction in the same language, but omitting the proviso, was condemned in *People v. Spranger,* 314 Ill. 602. The instruction in this case takes into consideration all the defenses which defendant urged or which might have been interposed for him. It was therefore not improperly given.

The third instruction given on behalf of the prosecution defines circumstantial evidence and informs the jury of the weight to which it is entitled. An instruction in the same language was approved by this court in *People v. Guido,* 321 Ill. 397.

The fifth instruction given on behalf of the prosecution is in the language of the statute defining justifiable homicide. Defendant claims that the instruction fails to define justifiable homicide in the defense of habitation or to properly distinguish between homicide in defense of habitation and homicide in self-defense. A number of other instructions given on the part of both the defendant and the prosecution sufficiently define self-defense and defense of habitation.

Instruction No. 7 given on behalf of the People is to the effect that the law of self-defense does not give to the defendant the right of attack in the first instance or permit retaliation for revenge. It is insisted that in the defense of habitation one has the right of attack in the first instance, and that the instruction is therefore erroneous. The instruction given pertains only to the right of self-defense

and does not undertake to define the law of defense of habitation. It was not necessary to state all the law on both subjects in one instruction. A similar instruction was approved in *People* v. *St. Lucia,* 315 Ill. 258.

Instruction No. 8 told the jury that before the defendant can avail himself of the right of self-defense it must appear that at the time of the killing the danger was apparently so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm the killing was absolutely necessary or apparently necessary, and that it must also appear the person killed was the first assailant. It is criticised on the same ground as the seventh instruction, and what is said concerning it is applicable to the eighth instruction.

The ninth instruction given on behalf of the prosecution stated that the jurors were at liberty to disregard all of the testimony of any witness who they believed had willfully sworn falsely to any matter material to the issue unless corroborated by other credible evidence or by facts or circumstances in evidence. The conflict and discrepancies in the testimony justified the giving of the instruction.

The court did not err in refusing to give an instruction which told the jury that in the defense of habitation against an attempt to unlawfully enter it one has a right to resist such effort even to the taking of human life, and it is not necessary that such person should believe he is in danger of losing his life or receiving great bodily harm to warrant an acquittal. In order to justify a killing in defense of habitation the intruder must be one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, robbery, burglary and the like, or endeavors in a violent, riotous or tumultuous manner to enter the habitation for the purpose of assaulting or offering personal violence to someone dwelling or being therein. The law declares that a bare fear of any of such offenses shall not be sufficient to justify the killing. It

must appear that the surrounding circumstances were sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears and not in a spirit of revenge. The instruction ignored these elements.

Defendant's refused instruction No. 2 told the jury that any person entering upon the premises of another is a trespasser and may be ejected by the occupant, who may use such force as is necessary or apparently necessary to eject the trespasser. The instruction is patently erroneous.

Defendant's refused instruction No. 4 states that if the deceased had been forbidden to enter the residence of defendant and had attempted to do so, unless the evidence shows that he was an officer armed with the necessary authority of law, defendant had a right, under the law, to use what force was necessary or apparently necessary to keep him from entering, even to the taking of the life of the deceased. This instruction ignores the same requirements of the law as are omitted from the first refused instruction above mentioned.

The fifth instruction offered by defendant and refused by the court is unintelligible.

We observe no substantial error in the giving or refusing of any instruction.

Defendant urges as a ground for reversal that the jury was selected under the provisions of the act providing for women jurors, (Laws of 1929, p. 539,) which act this court held to be unconstitutional. No challenge to the array was made and no objection to the competency of any juror was interposed during the trial but the jury was accepted by both parties. After a verdict against defendant had been returned he raised the question by a motion for a new trial and in arrest of judgment. A trial by jury may itself be waived, (*People* v. *Fisher,* 340 Ill. 250,) and it follows that any lesser right or privilege incident to such a mode of trial can also be waived. The failure to make

the objection in apt time amounted to a waiver of it. *People* v. *Hotchkiss,* 347 Ill. 217.

Defendant had a fair trial, free from substantial error, and his guilt was conclusively proven. The judgment of the trial court is therefore affirmed.

*Judgment affirmed.*