# BURL JONES v. STATE.

No. A-10234.   Sept. 8, 1943.

(141 P. 2d 109.)

286

Streeter Speakman and Moraul Bosonetto, both of Sapulpa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and L. A. Wallace, Co. Atty., of Okmulgee, for defendant in error.

BAREFOOT, J. Defendant, Burl Jones, was charged in the superior court of Okmulgee county with the crime of murder, was tried, convicted and sentenced to serve a term of life imprisonment in the penitentiary, and has appealed.

The charge against this defendant was the outgrowth of the killing of John Howard Evans, on January 26, 1933. The body of deceased was found under a culvert near Eufaula, in McIntosh county, a distance of about 50 miles from the town of Mounds, in Okmulgee county, a day or two following the alleged date of the killing.

It may be noted that the preliminary complaint charging this defendant with the crime of murder was filed on January 24, 1941, almost eight years after the body of deceased was found. The information upon which he was tried was filed February 1, 1941. Defendant was first tried upon this information on February 19, 1941, and the trial resulted in a hung jury. Defendant was again tried on November 17, 1941, with the result as above

stated. The defendant is now in the State Penitentiary, pending a decision of this case, and for this reason his case has been advanced.

For a reversal of this case, it is contended:

"I. The evidence adduced by the state is not sufficient to sustain the conviction, for the following reasons:

"1. The evidence of the state, aside from the admissions against interest, is not sufficient to sustain a conviction.

"2. The evidence reciting admissions against interest is so discredited by the circumstances that it is not sufficient to sustain a conviction in view of the rule of law that this class of evidence is recognized as the weakest kind of evidence known to the law.

"II. The trial court erred in admitting incompetent and prejudicial evidence.

"III. The court erred in instruction No. 10, on the subject of alibi in that the court instructed the jury that the defense of alibi was not available if the jury should find that the defendant aided, abetted, advised, assisted or encouraged another in the commission of the crime, whereas there is no evidence nor theory advanced by the state upon the issue of aiding or abetting by the defendant:"

A consideration of the first assignment of error necessitates a short review of the evidence, and especially by reason of the length of time between the killing of deceased and the filing of charges against this defendant, a period of almost eight years.

On Saturday morning, January 28, 1933, it was reported to the office of the sheriff of McIntosh county that a dead man, which proved to be John Howard Evans, had been found under a culvert, approximately five miles north of Eufaula. There was a bullet hole in his head.

The sheriffs of McIntosh and Okmulgee counties made extensive investigations in their efforts to find who had committed the crime, and on January 31, 1933, the defendant and Joe Wills were arrested and a complaint filed in the justice court of Okmulgee county, charging them with murder. A preliminary examination was had on February 17, 1933, and Joe Wills was released, and the defendant held. An information was filed against the defendant in the superior court, and some time later the case was dismissed on the recommendation of the county attorney of Okmulgee county.

While these charges were pending against the defendant, he and Joe Wills were charged with the crime of counterfeiting, entered pleas of guilty, and were sentenced to the Federal Penitentiary at Leavenworth for a term of ten years. The defendant entered the Penitentiary on December 20, 1933, and was released on January 3, 1940.

After his release from the Federal Penitentiary, Joe Wills made a statement to the sheriff of Okmulgee county directly implicating the defendant with the murder of the deceased John Howard Evans, in Okmulgee county, on January 26, 1933, and this led to the refiling of the murder charge against this defendant.

Wills testified at the first trial when there was a hung jury, and also at the second trial when the defendant was convicted. His evidence was that he was working for defendant at his garage in Mounds prior to January 26, 1933. That defendant sold a Chevrolet car to John Howard Evans some two or three months before he was killed, and that witness was present when the deal was made. That Evans paid cash for the car, in the sum of $714, but at his own suggestion gave the defendant a mortgage on the same, so that if he should be caught with

liquor therein, defendant could claim the car, and it would not be confiscated. That this plan was carried out, and Evans and his wife left soon thereafter in the car for California. They mortgaged the car while in California. In the meantime, the note and mortgage given to defendant had been transferred to the Liberty Investment Company of Muskogee, headed by a Mr. Board. (Defendant testified that Evans did not pay cash for the car, and after making two payments permitted the payments to become delinquent.) Wills further testified that after Evans returned from California, he and the witness went to Dallas, Tex., where they were arrested upon a warrant sworn out by Mr. Board, and that the defendant and Mr. Board went to Texas and secured their release. The Evans car was turned over to the finance company, and a few days thereafter he secured another car, a Ford coupe, from a dealer in Tulsa. Wills testified that Mr. Jones bought the Evans car when it was sold under the mortgage, and that Jones procured the Ford for Evans.

Wills further testified that on January 26, 1933, Evans came to his home in Mounds and told him that he had been to Sapulpa to see a lawyer, and was going to bring suit against Jones on the car deal. That he and Jones and Evans met about 9 o'clock in the morning, and Jones told Evans he would go to Muskogee with him and get his car back, and they were getting ready to go. Wills asked Evans to take a package for him from the garage where they were talking to his home. He testified:

"* * * I asked them if they would take this package down to the house in this car. I rode down with him— Herb (John Howard Evans) drove me down, taken the package out and Herb drove off. That is the last time I ever saw him alive. Q. Do you know what kind of

car he was driving? A. Yes, sir; Ford coupe that Burl got at Tulsa."

This was on the day Evans was murdered. Wills then testified that about 11 or 11:30 in the morning, this same day, the defendant returned to his home in Mounds, driving a Nash car. That witness got in the car, and the defendant drove out in the country about a mile or a mile and a half north of Mounds, and there told him that he had killed Evans. His testimony was as follows:

"Q. What kind of Nash was it, do you remember? A. Sedan. So we went out about a mile, or mile and a half north of Mounds, pulled out side of the road, and he asked me if I was a good friend of his. 'Well,' I said, 'Always have been.' 'Well,' he said, 'Going to tell you I just bumped that big son of a bitch off.' I said, 'What?' 'Yes,' he said 'I killed that big son of a bitch, blowed his brains out.'"

Wills further testified that he had an appointment with his lawyer, R. C. Clark, at Tulsa, at the Mayo Hotel, and so told the defendant, and that defendant said: "I will go with you. I have this Ford coupe at the house and got to get rid of it." That the witness drove the Nash belonging to Jones, and Jones drove the Ford to Sapulpa, left it parked on the street, and got in the car with the witness, and they went on to Tulsa. That they left Tulsa about 1 or 2 o'clock in the afternoon. That at 4 o'clock in the afternoon Jones came to his house and wanted him to help him get rid of the body, testifying:

"A. Well, along about 4 o'clock, I judge, right at it, Burl he comes back down to the house. He said, 'Joe, you got to come help me load the son of a bitch, he is a heavy son of a gun.' 'Well,' I told him, 'I wouldn't even look at the man for a thousand dollars, let alone help you load him.' Q. Did he tell you where he killed him? A. He told me where he killed him. Q. Where did he tell you? A. Out at the farm."

On cross-examination he testified that he immediately told his wife and his sister and "Boy Green" that Jones told him he had killed Evans.

It is unnecessary to go at length into the cross-examination of this witness. It was the contention of the state that defendant killed the deceased, Evans, to keep him from giving him trouble about the automobile. It was the defendant's contention that he had nothing to do with killing Evans, and that certain other parties had procured Wills to tell this story.

We shall not go into the details of the testimony of other witnesses which gave circumstances tending to corroborate the evidence of the witness Wills. The defendant owned a farm four miles from Mounds. He had taken possession of this farm about the 1st of January, 1933. His brother-in-law and wife were living on the premises. Their testimony was damaging to the defendant. They testified to his coming to the farm on the morning of January 26th in a Ford coupe, and having a man in the car with him. That defendant and this unknown man were near the barn where the state contends the murder was committed. That just before he left, defendant asked his brother-in-law to "kinda keep your eye on the barn." They testified that he returned to the farm in the afternoon, and that they left the premises while he was there. This was the afternoon that the body of the deceased was supposed to have been taken to McIntosh county, a distance of some 50 miles, and placed under a culvert.

It was also proven that a bin in the barn contained oats, and when the body of the deceased was found, oats were found in the clothing and hair. The sheriff of Okmulge county testified that an examination of the bin disclosed blood stains. Boards with the blood stains were

removed and sent to the State Chemist, who did not make a report thereon, but explained to Sheriff Lenox that "it was pretty hard to make a determination between human and animal blood." Other circumstances were proven, which it is unnecessary to state.

The defendant's defense was that of an alibi. His contention was that on the morning of January 26, 1933, he went to town (Mounds) for breakfast about 7 o'clock, and talked with certain parties whom he mentions, and then went to Tulsa to attend a meeting of Chevrolet dealers at the Mayo Hotel. That about 11:30 in the morning he left the meeting, and met R. C. Clark, an attorney of Okmulgee, and Joe Wills in the lobby of the Mayo Hotel. That he talked with them about Joe Wills' counterfeiting case, and returned to Mounds about three or 3:30 and stayed at his garage while Otis Glenn, an employee, went to Sapulpa to get a deed recorded. He was at the garage until about 6 or 6:30. He gave the names of parties who saw him, and testified to paying Mr. Raymond some money after four o'clock. About 8:30 he went to the hotel and asked about bridge players, bought a magazine and went home. He remained there reading until his wife and children returned from a recital they had attended at a church. He was corroborated in this testimony by other witnesses.

He testified that the first time he heard of or saw the deceased Evans after his return from California was when Wills called him to come to his house, saying that Evans was there and wanted to talk with him about his car. The next he heard was that Evans and Wills were in jail in Dallas, Tex., on a "hot car" charge. That he went to Muskogee and with Mr. Board of the finance company went to Dallas and helped to secure the release of Wills and Evans. He denied buying the Ford car for

the deceased, as testified by Wills, but said that he had recommended Evans to a Mr. Chowning at Tulsa, who handled his second-hand cars, and that Evans bought the Ford from Chowning. He denied being at his farm on January 26, 1933, and denied telling the witness Wills, or anyone else, that he had killed Evans, or that he tried to get Wills to assist in disposing of the body. He produced a number of witnesses to corroborate different points of his evidence, and especially as to his whereabouts on January 26, 1933.

There was also much evidence of the activities of one Warren, with reference to having the charge of murder refiled against the defendant. The defendant Jones had purchased a lumberyard from Warren after his release from the Federal Penitentiary, and was paying it out. The evidence revealed that he had paid a substantial sum on the indebtedness, and that Warren was trying to get the lumberyard back. It was contended by the defense that Warren had influenced the witness Joe Wills to testify as he did against the defendant, and that Warren had offered to compensate him for so testifying. The testimony of the witness Wills was:

"Q. Did Warren ever promise you anything? A. No. Q. Ever give you anything? A. No, sir. Q. Or help you in any way? A. He told me if I got a chance to buy a butcher shop in Mounds, he would raise the money."

On cross-examination he testified:

"Q. That is the same time he wanted you to go down to Okmulgee, and be a witness against Burl Jones? A. Well, I expect I talked to Mr. Warren a dozen times. Q. That is the time he offered to fix you up, buy a butcher shop, if you would be a witness against Burl Jones? A. After Burl was tried at the preliminary. Q. All I want to know is just the facts. That was what Warren came down for, to fix you against Burl Jones,

wasn't it? A. Well, in a way, I guess it was. Q. Offered to fix you up with a butcher shop sometime? A. Yes, he offered to."

Defendant also produced a number of substantial witnesses who testified as to his good character and reputation prior to his being charged with this murder.

After a careful examination of the record, we find that the evidence offered by the state is not insufficient to sustain the judgment and sentence. It is true that it is conflicting; that close questions of time are involved as to whether defendant could have been present at the place where it was necessary for him to be in order to have committed the crime, and that the proof at time depends upon circumstantial evidence. Gregg v. State, 69 Okla. Cr. 103, 101 P. 2d 289. But, taken as a whole, we are of the opinion that we would not be justified in holding that it was insufficient to sustain the judgment and sentence.

In saying this, we have taken into consideration the testimony of the witness Joe Wills, a part of which consists of statements made by the defendant, and which are known in the law as statements against interest. It is true that this evidence is received and considered with caution. 22 C. J. S., Criminal Law, § 730, p. 1248; People v. Christocakos, 357 Ill. 599, 192 N.E. 677; People v. Gibbs, 349 Ill. 83, 181 N.E. 628; Herbert v. Lankershim, 9 Cal. 2d 409, 71 P. 2d 220. But there is sufficient direct and circumstantial evidence to justify the submission of the question of guilt to the jury, as shown by the foregoing statement of the evidence. The other questions raised by the defendant will be hereinafter discussed.

The second contention of defendant is that incompetent, hearsay and prejudicial evidence was admitted.

This contention is based upon the evidence of John Mc-Quillan, sheriff of McIntosh county. He testified that soon after finding the body in McIntosh county, he went to Muskogee and got a party from the office of the finance company to go with him to Sapulpa, where he made certain investigations, and later went to the farm of defendant in Okmulgee county, where he found a Nash car belonging to defendant. His testimony was as follows:

"Q. What did your investigation disclose out there, Sheriff? A. I found the kind of car I was looking for. Q. What was it? A. Nash, four-door sedan. Q. Why were you looking for a Nash? A. In my investigation I learned there was a Nash car, old-like car— Mr. Eaton: Whatever he learned is hearsay. The Court: Unless it is connected up it wouldn't be material. Overruled. Mr. Eaton: Exception. A. Shall I go ahead? Q. Yes. A. I learned there was a Nash car something like—well, the early model car was larger than they are now, must have been a '26 or '27 Nash from the way they described it. *This car was parked on the side of the road, something like 50 or 60 yards from this culvert, on the night the body was supposed to have been left there.* Mr. Board had those finance papers—handled some of Jones' paper, I don't know whether all of it. I went there and found they had that kind of a car. Mr. Eaton: We object as incompetent, irrelevant and immaterial. The Court: Tell what you did. Did you see the car? A. I did, I went to the garage. Q. Which garage? A. Jones' garage in Mounds, asked about a car of this description, and the boy—I didn't know who he was, told me— Q. Did you find the car? A. I found the car at Jones' farm, which turned out to be in Okmulgee county."

And on cross-examination, he testified as follows:

"Q. Where did you first learn about this Nash car? A. Just a day or so, probably a couple of days after I found the body. Q. You never brought that Nash down where the body was? A. No, sir. Q. Somebody told you

all you knew about the Nash car? A. A fellow told me he seen that kind of a car that night. Q. What was his name? A. His name? Q. Is he here? Mr. Pitchford: He was subpoenaed. A. I know him well, but the name slips my mind—Sweeney, something like that. Q. You based your further investigation on what he told you, whoever he was? A. What was it? Q. You based your further investigation on what he told you? A. I wouldn't have looked for this car that had been here—it was out there on that particular night, but I was looking for that kind of a car. Q. They were things somebody told you? A. Sure. Q. You didn't know a thing about that car being down there except from hearsay? A. That's all. Mr. Eaton: We move to strike all that, based upon hearsay, incompetent, irrelevant and immaterial. The Court: Overruled. Mr. Eaton: We except."

We are of the opinion that a part of this evidence was incompetent. That part in which the witness testified: "This car was parked on the side of the road, something like 50 or 60 yards from this culvert, on the night the body was supposed to be left there," is clearly incompetent and hearsay testimony. This witness did not see the car there, and could only have been testifying to what others told him, and not in the presence of the defendant. But when taken into consideration with the testimony of the witness Sweeney, who testified to seeing a Nash car parked by the roadside near the culvert where the body of deceased was found, on the date charged, we cannot say that the admission of this evidence, although incompetent, would be sufficient error alone for the reversal of this case.

There was also evidence with reference to the finding of the shoes of deceased some distance from where the body was found. This evidence would be with reference to the weight to be given same by the jury, rather than to the competency of the same.

The witness Bond was asked by the state if defendant kept whisky in the barn. He answered, "not continuously, no"; but said he had kept it there two or three times, in small amounts he had taken on trades. This evidence was incompetent, and should not be permitted if this case is retried.

It is next contended by the defendant that the court erred in giving to the jury instruction No. 10, which was as follows:

"The defendant has interposed in this case as one of the defenses, what is known in law as an alibi, that is, that the defendant was at another and different place at the time of the commission of the crime. The law is that such a defense is proper and legitimate and that the jury should consider all of the evidence bearing upon his point, whether introduced by the state or the defendant, and if after a careful consideration of all the evidence in the case, the jury entertain a reasonable doubt as to whether the defendant was in such other place when the crime was committed, then and in that event, the jury should give the defendant the benefit of such doubt and acquit him, *unless you should further find, beyond a reasonable doubt, that at or before the crime was committed, the defendant had aided, abetted, advised, assisted or encouraged some other person in the commission thereof.*"

It is admitted by the defendant that no exception was taken to the giving of this instruction, but it contends that the last part of this instruction, which states: *"unless you should further find, beyond a reasonable doubt, that at or before the crime was committed, the defendant had aided, abetted, advised, assisted or encouraged some other person in the commission thereof,"* is so fundamentally wrong and prejudicial, in view of the charge and the evidence in this case, that the same should be considered, although an exception was not taken to the giving of the same.

We have carefully examined the many authorities cited in the briefs of both parties, and we are familiar with the rule that has so often been announced with reference to the consideration by this court of instructions where no exception was taken at the time of the trial.

This rule was early announced by this court in the case of Dooling v. State, 3 Okla. Cr. 491, 106 P. 982, when it was said:

"An error, not excepted to during the trial or in the motion for new trial, and urged for the first time in this court, will not be reviewed unless fundamental and clearly deprived the accused of a substantial right."

This doctrine has been closely adhered to since that time. Rogers v State, 8 Okla. Cr. 226, 127 P. 365; Humphrey v. State, 8 Okla. Cr. 449, 128 P. 742; Ryan v. State, 8 Okla. Cr. 623, 129 P. 685; Morrison v. State, 37 Okla. Cr. 359, 258 P. 1050; Walkenhorst v. State, 38 Okla. 180, 259 P. 663; Williams v. State, 40 Okla. Cr. 303, 268 P. 329; Stribbling v. State, 41 Okla. Cr. 252, 272 P. 488; Callahan v. State, 42 Okla. Cr. 425, 276 P. 494; Jarman v. State, 57 Okla. Cr. 226, 47 P. 2d 220; Stump v. State, 66 Okla. Cr. 391, 92 P. 2d 616; Franklin v. State, 71 Okla. Cr. 115, 109 P. 2d 239; Knight v. State, 73 Okla. Cr. 107, 118 P. 2d 255, 256; Story v. State, 73 Okla. Cr. 273, 120 P. 2d 387; Tyler v. State, 74 Okla. Cr. 39, 122 P. 2d 826.

In many of the cases cited and decided by this court, the judgment has been reversed for the reason that the error in the given instruction was "fundamental and clearly deprived the accused of a substantial right." In others the instruction has been held as harmless, and especially in view of the other instructions given and a consideration of the whole record in the case.

As to the above rule, both parties in their briefs are in accord as to the true rule of this court as above an-

nounced. It therefore resolves itself into the question as to whether the instruction given in the instant case, and in view of the whole record, is so fundamentally wrong and prejudicial that it deprived the defendant of a substantial right, and that it will therefore be considered, although no exception was taken thereto.

The state in its brief, in answer to the contention of the defendant, says:

"In order to clarify the issue, we shall confine our argument to two propositions:

"First: Due to the state of the record showing that no exception or objection was taken to the instruction, the trial court did not commit a fundamental error of such character that is subject to review on appeal.

"Second: If the assignment is subject to review, the instruction did not materially injure the defendant in the way of depriving him of a right essential to his alibi defense, and, therefore, the trial court did not commit reversible error by giving said instruction."

These two propositions may well be considered together in view of the rule heretofore stated.

In the instant case, the defendant Burl Jones alone was charged in the information with the murder of the deceased, John Howard Evans. There was no charge that any party was connected with the killing, other than the defendant. He was not charged with "aiding or abetting" anyone in the planning or commission of this crime. The state in presenting its evidence gave no testimony that in any way connected any person with the killing other than the defendant. From the record as a whole, the jury could have surmised that some one other than the defendant assisted in the commission of the crime, and for this very reason the giving of that part of the instruction on "aiding and abetting" was damaging to

the defendant. His defense was that of an alibi. This instruction deprived him of that defense if the jury believed that he "aided or abetted" someone else in the charge against him, and the evidence did not justify this belief.

It is urged by the defendant in his brief that the jury in this case could have come to the conclusion that the witness Joe Wills, who testified against the defendant, or others who were associated with him, committed this crime, and that the defendant "aided and abetted" them in its commission; therefore, under this instruction, if they so believed, he would be deprived of the defense made by him—that of an alibi. We can easily see how this might be true.

We have examined the authorities cited by defendant, and find that they support the contention which he makes, as applied to the record and evidence.

The general rule is laid down in 23 C.J.S., Criminal Law, p. 906, § 1312, where it is said:

"However, an instruction must be based on and applicable to the issues supported by the evidence, and although an instruction may state a correct principle of law, if it is not based upon or in conformity with the issues or facts raised or supported by the evidence it is erroneous * * *."

Also in 14 R.C.L. p. 790:

"If an instruction is not thus based on the evidence it is erroneous in that it introduces before the jury facts not presented thereby, and is well calculated to mislead and induce them to suppose that such a state of facts in the opinion of the court was possible under the evidence, and might be considered by them. * * *

"The courts, however, ordinarily regard the giving of an instruction having no basis or foundation in the

evidence in the case in which it is given as prejudicial, unless it is clearly apparent the jury could not have been misled by it."

The following cases clearly support the text above quoted, and are directly in point: State v. Byrd, 278 Mo. 426, 213 S.W. 35; State v. Baum, 47 Utah, 7, 151 P. 518; State v. Marasco, 81 Utah, 325, 17 P. 2d 919; People v. Rongetti, 331 Ill. 581, 163 N.E. 373; and People v. Sheffield, 108 Cal. App. 721, 293 P. 72.

In the Byrd Case, supra [278 Mo. 426, 213 S.W. 37], it is said:

"Instruction numbered 2, given by the court, is based on the assumption that there was testimony that another than the defendant had fired the fatal shot, and the jury is told that, if they believe the defendant was present, aiding and abetting, they may find him guilty. The error in the giving of this instruction consisted in the fact that there was no evidence to sustain it. The only inference on which the assumption could be based was that there were other shots fired at about the time the defendant was pursuing and shooting at the deceased; that such other shots were fired at the latter there is no evidence; nor is there any other fact to sustain the assumption that any one was acting in conjunction with the defendant. There was no authority therefore, for the hypothesis in the instruction of a common design or a community of purpose as existed in State v. Murray, 193 S.W. [830] loc. cit. 832, and other cases of like type cited in respondent's brief. While in the abstract, the instruction may not be subject to criticism, it rests upon nothing more substantial than that it may have been possible for the fatal shot to have been fired by another than the defendant. This will not suffice to sustain a conviction. While it is not to be questioned that proof of an aiding and abetting in the commission of a crime may be shown by circumstantial evidence, none was adduced of sufficient probative force to justify the giving of this instruction."

In the Baum case, supra [47 Utah 7, 151 P. 519] it is said:

"Complaint also is made of this charge:

" 'All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, are principals in any crime so committed.'

"Such a charge may be proper enough. in a proper case; but the court had no such case before it. There were neither pleadings nor evidence to render such a charge pertinent. What the state charged was that the defendant directly entered the building and took the goods therefrom; and what it claimed by its evidence was that he, with two others, directly entered and took the goods —directly committed the offense. There was no evidence to show, and no one claimed, that the defendant but aided or abetted in the commission of the offense, or, not being present, advised or encouraged its commission. There, hence, was no occasion to give that kind of a charge. Under the circumstances, we think it was misleading and harmful."

In the Sheffield Case, supra [108 Cal. App. 721, 293 P. 73], the court says:

"The law is well settled that instructions given to a jury must be adapted to the evidence and circumstances of the case on trial. To give instructions, even though they contain a correct statement of abstract legal principles, which are prejudicial will warrant a reversal of a judgment of conviction, and constitutes error. See People v. Savinovich, 59 Cal. App. 240, 210 P. 526, involving a prosecution for arson, yet quite parallel to the case at bar."

We also call attention to the case of Whisnant v. State, 39 Okla. Cr. 214, 264 P. 837; Forrester v. State,

45 Okla. Cr. 205, 282 P. 682; and Dyer v. State, 58 Okla. Cr. 345, 53 P. 2d 700.

This court had occasion to discuss what constitutes fundamental error in the case of Morrison v. State, 37 Okla. Cr. 359, 258 P. 1050, where Judge Edwards says:

· "Fundamental error is error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense. Where it appears and justice requires, this court will consider it whether or not exceptions are taken in the court below or whether or not it be assigned as error on appeal."

See, also, Tyler v. State, supra.

The rule which should apply to the facts in the instant case and the reasons therefor are so well stated in the case of People v. Roe, 189 Cal. 548, 209 P. 560, we quote it:

"While there may be exceptional cases in which an inapplicable instruction will not prejudice defendant, when it is clear that such instructions are well calculated to mislead the jury, and in all likelihood affected their conclusion to defendant's prejudice on the only issue in the case, the giving thereof, though correct in principle, is prejudicial error." And in the body of the opinion, the court said:

"The error of inapplicable instructions rests in the fact that they pertain to points not 'pertinent to the issue,' and contain matters of law for the jury's consideration not 'necessary for their information,' and therefore, instead of enlightening, tend to confuse and mislead the jury. This is so because such instructions, in effect, either create a false issue or constitute a misstatement of the real issue, thereby distracting the attention of the jury from and befogging the real issue.

"There may be, of course, exceptional cases in which an inapplicable instruction will not operate to the preju-

dice of a defendant in a criminal case, but when it is clear, as it seems to us in the instant case, that such instructions are well calculated to mislead a jury, and in all likelihood affected their conclusion to the prejudice of the defendant upon the only issue in the case, the giving thereof, even though correct in principle, constitutes error equally as grave as would be the giving of instructions fundamentally wrong. People v. Devine, 95 Cal. 227, 30 P. 378."

See, also, La Shar v. People, 74 Colo. 503, 223 P. 59, and People v. Barton, 72 Cal. App. 431, 237 P. 767.

From what has heretofore been stated, it will be observed that we are of the opinion that the giving of the instruction above quoted was fundamental error, and that by the giving of the same this defendant was deprived of a substantial right, and from an examination of the whole record, that the harmless error doctrine should not prevail in this case.

We refrain from a further discussion of the facts.

The record discloses that this defendant is now confined in the State Penitentiary at McAlester. The warden of the penitentiary is hereby directed to release this defendant to the custody of the sheriff of Okmulgee county, pending the further order of the superior court of that county; and the judgment and sentence of the superior court of Okmulgee county is reversed, and the case remanded.

JONES, P. J., concurs. DOYLE, J., dissents.