Larry Wendle SMITH, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–73–6.

Court of Criminal Appeals of Oklahoma.

Oct. 11, 1973.

Rehearing Denied Oct. 18, 1973.

Clyde F. Ross, Okemah, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Charles P. Rainbolt, Legal Intern., for appellee.

OPINION

BUSSEY, Judge:

Appellant, Larry Wendle Smith, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Okfuskee County, Oklahoma, Case No. CRF–72–9, for the crime of Murder. His punishment was fixed at life imprisonment and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial Ray Lambert testified that he was a firearm examiner for the Oklahoma Bureau of Investigation; that on April 28, 1972, he examined a .22 caliber revolver which was given to him by Wiley Brewer, Sheriff of Okfuskee County. He also examined a .22 caliber bullet, six .22 caliber cartridge cases, ten rounds of .22 caliber ammunition, and ten .22 caliber "short" rounds of ammunition, all of which

were properly marked and identified as exhibits of the State. Lambert further testified that in his opinion State's Exhibit 6, a cartridge case, was fired in State's Exhibit 4, the revolver.

Wiley Brewer testified that on April 8, 1972, he was the duly elected Sheriff of Okfuskee County and that at approximately 12:45 p. m. he received a call to the effect that there had been a shooting and that the victim had been taken to the Okfuskee County Hospital at Okemah, Oklahoma; that in his investigation he had talked to Terry Sands on the street of Okemah, then went to the home of Charles Smith on N. 8th Street, where he found the defendant, Larry Smith. He placed the defendant under arrest and took him to the Sheriff's Office. At the Sheriff's Office he advised the defendant of his constitutional rights, searched the defendant, and removed six .22 caliber shells from the defendant, later taken to the Crime Laboratory.

He later talked to Terry Sands in the presence of defendant, Larry Smith, asked him where the pistol was, and the defendant spoke up and said "Go ahead and tell them." Sands related to the Sheriff that he had thrown the pistol into a pond. Sands then took the Sheriff to the pond where he had thrown the gun away.

The Sheriff and two deputies thereafter went to the scene of the shooting, that being the 62 Drive-In, where they found blood on the ground and five empty shells located five or six feet away from the blood. The shells were sent to the Crime Lab. The Sheriff further testified that the gun was recovered by the Highway Patrol from the pond on April 19, 1972. The gun contained five shells: one fired, one snapped, and three live ones, all of which were delivered to the Crime Lab.

Harlen Scott testified that on April 19, 1972, he was employed by the Oklahoma Highway Patrol and assigned to the lake patrol; that he and one Lieutenant Hughes, pursuant to a request from the Sheriff's Office, recovered a gun from a pond.

A. F. Magrum testified that he was employed as a Deputy Sheriff in Okfuskee County, and that on April 9, 1972 he received a package from the Assistant District Attorney purporting to contain a bullet, and locked same in the safe downstairs.

Noel Miller testified that he was a medical doctor and during the early morning hours of April 9, 1972, he examined Larry Fisher, Jr., in the Emergency Room. The patient made approximately three or four gasps for breath and then expired. The patient had a wound of the sternum, three abrasions on his head, one abrasion at the bridge of his nose, one abrasion at the left frontal parietal area, and one abrasion at the right frontal parietal area. Thereafter, he performed an autopsy to determine the cause of death and recovered a bullet which had been lodged in the spine behind the heart. He placed the bullet in a kleenex and placed the kleenex in an envelope, sealing it in the presence of Dr. Cole, Mr. Parks and Mr. Riley.

Dr. Miller then identified State's Exhibit 11 as being the bullet taken from the deceased. The witness further testified that in his opinion deceased had died as a result of the bullet wound.

Kevin Daniel, a court reporter, testified that he was present on April 9, 1972, when certain witnesses were questioned in the Sheriff's Office and that he heard the defendant at that time say, "If you know where it is, tell him." He further testified that the defendant was not advised of his constitutional rights at this meeting in his presence.

Franklin D. Rahhal, Assistant District Attorney, testified that he was at his home in Okemah when Dr. Miller came and gave him the bullet he (Dr. Miller) had removed from the deceased.

The State, through numerous other witnesses, further presented the following evidence: On September 29, 1971, the deceased, his wife, mother and sister went to Okemah, Oklahoma, and stopped at the Blue Moon Bar, staying approximately two hours. They then proceeded to the 62 Cafe located east of Okemah. Approxi-

mately 6:00 or 7:00 p. m. the deceased left with Dewayne Smith and several other "boys" to go to Clearview, Oklahoma. Approximately two hours later the deceased returned from Clearview and went back to the 62 Cafe. The deceased was pretty well intoxicated at this time.

A fight occurred at the 62 Cafe between Dewayne Smith (defendant's brother), James Farris and Jimmy Vance. Smith and Farris then left the 62 Cafe. The deceased, accompanied by his wife, sister and Marcus McNally, went to the Blue Moon Bar to ascertain why Dewayne Smith had attacked Jim Vance. About midnight the deceased located Dewayne Smith in front of the Blue Moon Club, a fight followed and Dewayne Smith struck the deceased with a "blackjack." Upon seeing the deceased was bleeding, the deceased's wife hit Smith over the head with a pop bottle, knocking him to his knees. Thereafter, the defendant, after seeing his brother lying on the ground, began asking who was responsible and a fist fight between the defendant and deceased resulted. The defendant fired his gun several times, not injuring anyone at this time. After the fight, the defendant, James Farris and Dewayne Smith left in a pickup truck.

The deceased and his wife then drove out to the 62 Cafe again. There the deceased and the defendant got into another fist fight. While they were down on the ground and the defendant was on top of the deceased, the deceased's wife grabbed the defendant by the hair of the head and pulled him off the deceased. The deceased then went toward one McNally's car to obtain a tire tool, but McNally prevented him from obtaining the tire tool by holding the deceased. While McNally was holding the deceased, the defendant reloaded his gun. While McNally was restraining the deceased, some of the other "boys" pulled McNally away from the deceased. The defendant then told the deceased he was going to make him beg, but the deceased refused to do so. The deceased then went toward the defendant in a manner appearing that he was going to apologize. The defendant then shot the deceased, the de-

ceased fell to the ground and the defendant stated, "Look at him lying over there acting like he was dead and all it was, was a blank."

The defendant then got in the car with one Terry Sands and left the scene. The deceased's wife took him to the Okfuskee Hospital where he died.

The defendant through numerous witnesses, including himself, presented in substance, the following evidence: On April 9, 1972, the defendant, his brother (Dewayne), Charles Smith, Eddie Whitson and Alvin Carmen went to "Grassey Lake" snake hunting. The defendant was hunting with a .22 caliber pistol (State's Exhibit 4). After hunting, the party returned to Okemah, where the defendant and Alvin Carmen got off at the Blue Moon Bar where they played dominoes, pool and drank beer. Thereafter, the defendant's brother, his nephew, and James Farris came in the Blue Moon Bar and informed him (defendant) his brother had had a fight out at the 62 Cafe with James Vance. At this time the defendant still had his pistol in his pocket. At approximately 11:30 p. m. the deceased and his wife came into the Blue Moon Bar. The defendant's brother then left the bar and a few minutes later the deceased and his wife left the bar. About five minutes thereafter the defendant left the bar and found his brother lying on the sidewalk, hollering that he couldn't see. The deceased was hollering at the defendant that he was going to whip him as he couldn't beat up on his friend and get away with it. The defendant replied that he did not have anything to do with the fight, and that his brother had whipped the deceased's friend. Thereafter, the deceased started fighting with the defendant. The fight was broken up and the defendant got into his pickup truck while the deceased was put in a car. As the defendant was leaving, the deceased started hitting the pickup truck with something.

The defendant and James Farris took Dewayne (defendant's brother) to his sister's house, after which James Farris drove the defendant out to the 62 Cafe. Thereafter, while the defendant was stand-

ing outside the 62 Cafe, the deceased drove up, got out of his car, started toward the defendant and began hollering at the defendant that he was going to beat him up and kill him for jumping on his friend. The defendant told the deceased he did not want any trouble, but the deceased came on toward him and they started fighting. The deceased's wife pulled the defendant off the deceased by the hair of the head and the deceased then went to his car and got a tire tool, which he started swinging, hitting the defendant on the legs and ribs.

The defendant and the deceased continued to fight and the defendant got his gun out and it went off. The defendant did not intentionally shoot the deceased.

After the defendant shot the deceased, he got scared and "took off" with Terry Sands, whom he gave the gun to, telling him to get rid of it. Thereafter, the defendant was arrested by Sheriff Brewer. At the Sheriff's Office he was questioned but not advised of his constitutional rights. The defendant, while in the Sheriff's Office, told Sands "Go ahead and tell him where its at" and Sands then told the Sheriff where the gun was located.

The defendant's first proposition of error asserts that the evidence is insufficient to support the verdict of the jury and the judgment of the court.

This Court has consistently held that where there is competent evidence in the record from which a jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts. Smith v. State, Okl.Cr., 468 P.2d 807 (1970). Also see Kelly v. State, Okl.Cr., 415 P.2d 187 (1966) and McCluskey v. State, Okl.Cr., 372 P.2d 623 (1962).

Even though in the instant case the evidence presented by both sides was conflicting in many instances, we believe there was sufficient evidence to support the jury's verdict.

The defendant's second proposition asserts that the court erred in giving instruction number 18 to the jury. Instruction number 18 reads as follows:

"You are instructed that evidence has been offered tending to show flight by the defendant shortly after the commission of the crime alleged against him in the information. If you find from the evidence that the defendant did at some time flee from the place of the shooting and that such flight was induced by his apprehension of being charged with a public offense by reason thereof of Murder, this is a circumstance to be considered by you in connection with all the other evidence, to aid you in determining the question of the guilt or innocence of the defendant."

The defendant's argument under this proposition asserts that there was absolutely no testimony or evidence to indicate flight on the part of the defendant. We do not agree. In the instant case the defendant, immediately after the shooting, left the scene with one Terry Sands and while enroute to his uncle's house with Terry Sands, he requested Terry Sands to dispose of the gun. It is therefore our opinion that this evidence was sufficient to warrant an instruction on flight. We therefore find no merit to this proposition.

Defendant's third proposition asserts that the defendant was not advised of his constitutional rights. The defendant under this proposition is apparently contending that the statement he made to Sands while in the Sheriff's office concerning the whereabouts of the gun ("go ahead and tell them") was not admissible as he was not advised of his constitutional rights.

The record reveals that this statement was first brought out on direct-examination of Sheriff Brewer and the defendant did not object to the admission of this statement nor did he request an evidentiary hearing outside the presence of the jury on this matter. It is therefore our opinion that the defendant waived any error in the admission of this statement. Further we are of the opinion that the

statement made by the defendant to witness Sands directing him to tell the Sheriff where the gun was located was not in response to any question directed to him, but was a voluntary statement and Miranda warnings were not necessary. We therefore find no merit in this proposition.

It is our opinion that the judgment and sentence should be, and the same is hereby, affirmed.

BRETT, J., dissents, BLISS, P. J., concurs.

BRETT, Judge (dissents):

I respectfully dissent to this decision. As I view the evidence, it is not sufficient to sustain a verdict for the crime of murder; and secondly, considering the facts of this case, the giving of Instruction 18 constitutes reversible error.

At most, defendant should have been charged with the offense of first degree manslaughter, because the required elements for murder are not present. The incident, out of which this charge arose, resulted from a drunken brawl between friends. While the testimony was conflicting, the two consistent facts were: that defendant and the deceased man were friends; and, that the shooting was preceded by a fight between the two men and others present. Premeditation was not shown; nor was the condition of a depraved mind shown to exist, unless intoxication is depravity. Consequently, after reviewing the record, I believe the evidence is not sufficient to sustain the jury's verdict.

Likewise, there was no testimony offered to show that defendant attempted to "flee" to avoid prosecution. Admittedly, defendant went from the scene of the fight to the home of his uncle, where he was arrested about an hour after the shooting; but he did not leave or attempt to leave the vicinity of Okemah. The fact that he requested his friend to dispose of the pistol has absolutely no bearing whatsoever on the question of flight, as encompassed by Instruction 18. Consequently, I believe fundamental reversible error was committed when the instruction on flight was given over defendant's objections. The Attorney General's brief erroneously states, ". . . the State fails to find that defendant raised the objection to Instruction 18 either at trial or in the Motion for New Trial. Therefore, the defendant cannot raise an objection to Instruction 18 for the first time on appeal." At page 1128, of Volume II of the transcript of testimony, the record shows defendant objected to the instruction, and preserved his exceptions.

This Court stated in Jones v. State, 77 Okl.Cr. 285, 141 P.2d 109, 117 (1942), the following:

"The law is well settled that instructions given to a jury must be adapted to the evidence and circumstances of the case on trial. To give instructions, even though they contain a correct statement of abstract legal principles, which are prejudicial will warrant a reversal of a judgment of conviction and constitutes error."

At page 118, of the *Jones* decision, supra, this Court continued:

"The error of inapplicable instructions rests in the fact that they pertain to points not 'pertinent to the issue,' and contain matters of law for the jury's consideration not 'necessary for their information,' and therefore, instead of enlightening, tend to confuse and mislead the jury. This is so because such instructions, in effect, either create a false issue or constitute a mis-statement of the real issue, thereby distracting the attention of the jury from and befogging the real issue."

I believe Instruction 18 had a befogging effect, and distracted the jury from the real issue. That instruction so distracted the jury from the instructions on murder and manslaughter, as to effectively eliminate the manslaughter instruction from consideration by the jury. Insofar as the evidence was insufficient to show "flight," I believe Instruction 18 constitutes reversible error, under the facts of this case. Therefore, I respectfully dissent. I would reverse and remand this conviction for a new trial.