Ernest FIELDS, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant In Error.

No. A–12120.

Criminal Court of Appeals of Oklahoma.

May 18, 1955.

B. C. Franklin, Elliott H. Howe, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

The plaintiff in error, Ernest Fields, hereinafter referred to as defendant, was on 2 February, 1954 by information filed in the district court of Tulsa County, charged jointly with Lorenzo Alfonso Hayes with the murder of Vol Dale Royster, as a result of gunshot wounds alleged to have been wilfully inflicted on the body of the deceas-

ed on 12 December, 1953. A severance was granted Hayes, and the defendant Fields was tried before a jury, found guilty of murder and with punishment fixed at death in the electric chair in the State Penitentiary at McAlester. Appeal has been duly perfected to this court, and the sentence has been ordered stayed, as provided by law.

The record discloses that the defendant was arrested the late afternoon of 7 January, 1954; that he was not taken before the county attorney of Tulsa County until late the next afternoon; that charges were filed the morning following; that on 11 January, 1954 the court appointed Elliott H. Howe, one of the public defenders, to represent the defendant. He had not been represented by counsel prior thereto. Co-defendant Hayes had been arrested the afternoon of 5 January, 1954, was questioned briefly and did make one important admission, according to the county attorney, and then the next morning was asked if he would sign a statement. His family had employed Judge Leslie Webb to represent him, and Judge Webb was present and Hayes declined to make any written statement until after consulting with his attorney. After such conference on 6 January, 1954 Hayes did make a statement, but he detailed movements in Tulsa which would show that he never left Tulsa 12 December, 1953.

The officers on arresting defendant Fields the late afternoon of 7 January, 1954, took him first to the Tulsa County sheriff's office, but did not incarcerate him in the Tulsa County Jail, but, as they said, to keep the knowledge of his arrest a secret from Hayes and to forestall any possible communication between the two, took Fields to the county jail at Claremore, in adjoining Rogers County, where he remained most of the next day before being returned to Tulsa County. He was then immediately taken to the office of the county attorney and questioned. He did not confess to the crime, but on the contrary stoutly denied any knowledge of it. By interrogation taken down in shorthand by a reporter, accused did tell about making a trip with co-defendant Hayes in Hayes' Buick car to Coweta and Redbird the night of 12 December,

1953, being the Saturday night prior to the finding of the body of Royster on Sunday morning, at a point in Tulsa County shown to have been in close proximity to the points defendant admitted having visited the night in question. After this admission, charges were filed. The matters and happenings following defendant's arrest up to the time of arraignment, involving the trip to Claremore and delay in the filing of charges and arraignment, constitute the principal ground urged for reversal, as will appear hereinafter.

On trial, in addition to the public defender, the defendant Fields was also represented by B. C. Franklin and Judge Leslie Webb.

The record, containing over one thousand pages of testimony alone, was prepared at State expense. There were more than seventy exhibits. Forty-seven witnesses were used by the parties, including ten rebuttal witnesses by the State.

For reversal the overruling of defendant's motion for new trial is assigned as error, and under such heading some five points are urged, four of them having to do primarily with the admission or rejection of evidence. These "points" will be treated as propositions of error.

■ At the outset, we must note that the evidence against the defendant was wholly circumstantial. The court or jury may convict one charged with crime where the evidence is circumstantial, and circumstantial evidence may even support a conviction where the death sentence has been imposed. Mannon v. State, 68 Okl.Cr. 267, 98 P.2d 73; Ex parte Jefferies, 7 Okl.Cr. 544, 124 P. 924, 41 L.R.A.,N.S., 749.

■ Here on appeal, in considering the sufficiency of the evidence, we note the rule for guidance, and being that where the evidence against the defendant is wholly circumstantial, the circumstances proved must not only be consistent with each other, but consistent with the defendant's guilt, and inconsistent with any other reasonable hypothesis than his guilt. Hicks v. State, 70 Okl.Cr. 284, 106 P.2d 136; Fleetwood v. State, 95 Okl.Cr. 163, 241 P.2d 962; Wininegar v. State, 97 Okl.Cr. 64, 257 P.2d 526,

529. But contrariwise, this court has any number of times said:

"A conviction may be had on circumstantial evidence when all circumstances proven are consistent with each other and with hypothesis that defendant is guilty, and inconsistent with every other rational hypothesis." Wininegar v. State, supra, and cases cited.

■ There is a further principle that likewise must be kept in mind, and being that the findings of a jury on a disputed question of fact will not be disturbed on appeal where there is competent evidence in the record to sustain the jury's findings. Wininegar v. State, supra; Miller v. State, 92 Okl.Cr. 382, 223 P.2d 557; Sukovaty v. State, 94 Okl.Cr. 391, 236 P.2d 696; Odell v. State, 94 Okl.Cr. 159, 232 P.2d 158.

■ The propositions of error advanced by defendant involving the reception or rejection of evidence has made it incumbent on the court, after a study of the briefs and listening to oral argument, to read and study the entire record, parts being reread several times. Counsel have not summarized the evidence in every detail. The court, as an aid to its deliberations and in view of the death sentence assessed the defendant, has done so, but in summarizing the more than one thousand pages of evidence, such summary if made a part of this opinion would extend it to a prohibitive length. So that herein we shall only set out our own conclusions, mentioning pertinent portions in determining the sufficiency of the evidence, and treating the action of the court in admitting or rejecting evidence offered. We deem such procedure sustained by Tit. 20, O.S.A. § 47, as well as in accordance with the inherent power of an appellate court. The more detailed statement of the evidence found competent and to support the conclusions hereinafter reached, in addition to the copies retained by each member of this court, will be attached to the written opinion filed with the clerk of this court as a permanent record, a copy will be attached to a copy of the opinion forwarded with mandate to the court from which appeal has been perfected, and copies will be furnished counsel for the appellant and for the State.

We shall first consider defendant's proposition wherein it is stated: "The testimony produced by the State does not meet the requirements of the law on circumstantial evidence, and as set forth in instruction No. 8, given by the court in this case."

The instruction given by the court concerning circumstantial evidence was in accordance with the principles covering circumstantial evidence set out in the Hicks, Fleetwood and other cases that we have mentioned hereinabove, and which we have already detailed. It is approved.

As briefly as we may, we would point out pertinent proof developed by the State.

It was shown that a young recently-married white man, Vol Dale Royster, was employed by the McCoy Trailer System, 1321 North Peoria, Tulsa; that his hours were from 2:00 P.M. until 10:00 P.M.; that on the 12 December, 1953, his wife, Betty, brought his lunch to him, but on arriving at the trailer lot office at 7 o'clock she could not find her husband. She did find the office in disorder, the money drawer of the desk, being the middle drawer, pried open and the cash box missing. She telephoned Truman D. McCoy, the owner, whom the evidence showed had, with his wife, left the lot about 5:30 P.M. that day, leaving Royster in charge. At the time, Royster wore a red jacket or plaid shirt and dark trousers. He had a chain from his belt buckle to his pants pocket with a packet of keys attached, and a gold chain fastened to his shirt pocket, which had a Ronson cigarette lighter attached, so that McCoy had on departing remarked to Royster that he was "certainly chained up". No State witness ever saw Royster alive after 5:30 P.M. that day, which was Saturday. Between 8:00 and 9:00 o'clock the next morning, Sunday, two farm hands found the body of Royster in a ditch and just off a little oak bridge on a one-way country road running from the asphalted Tulsa-Wagoner county road, running north and south along the county line, and eight and a half miles south of Broken Arrow.

Digressing a moment: Don Lanier, who lived eight and a half miles south of Broken Arrow, and whose mail box was located one half mile from his home on the east side of the asphalt road in question and about thirty feet from the bridge where the body was found, had gone to his mail box about 8:30 P.M. 12 December, 1953, and he saw a pool of what he took to be oil on the northeast corner of the bridge. About 11:30 the next morning he saw that the pool was red, and appeared to be coagulated blood. There were many people present at this time.

The point where the body was found was in Tulsa County. The road crossed the Ted Barron farm. The persons finding the body that Sunday telephoned the highway patrol and the county and city officers, and an ambulance soon arrived at the scene. There was a pool of blood on the oaken bridge, and in the center of the pool was an apparent bullet hole, and an empty .45 calibre automatic shell was found underneath the bridge, and on an angle from the bullet hole and a few inches in the ground was a .45 calibre bullet. An autopsy showed that a bullet had entered Royster's left shoulder on the back and come out of his neck, and one slug entered the base of his head and came out at the front over his eyes. Plaster casts of tire tracks and heel prints were made. Some dimes and pennies were found about twenty-five feet west of the bridge where the sandy loam indicated a struggle. All this evidence was sent to the FBI laboratories in Washington, D. C. A sample from the pool of what appeared to be blood was sent to the FBI and it was determined to be blood and of the type of the deceased—international group O.

Deputy Sheriff Houston Johnson of Tulsa County and Deputy Sheriff Dryden Orcutt of Wagoner County commenced working on the case. They were particularly checking on strangers at Coweta and Broken Arrow on Saturday night, 12 December, 1953.

On the 2 January, 1954 a young boy, Wayne Criner, was driving his father's tractor near his father's place, two miles north of Coweta on the old 51 Highway running between Broken Arrow and Coweta, when he noticed a yellow object in the roadside ditch and in a pool of water. He fished this out and it proved to be a trailer

hitch, numbered 39. Attached to the trailer hitch was a piece of cloth in which was wrapped two billfolds, a chain attached to which were a pack of keys, a photostatic copy of the discharge of Vol. Dale Royster from the military service; and also his social security card. Later pieces of plastic shown to have been parts of the money box taken from the McCoy Trailer System office were found nearby over the fence.

The No. 39 trailer hitch was identified by Mr. McCoy as missed after Royster disappeared, and it developed that it was a hitch for Buick cars and his records were checked as to previous renters, and a number of leads checked out, including a rental for 4 December, 1953 to Lorenzo Hayes.

It was found that a number of responsible, long-time Negro residents of the Coweta area saw Lorenzo Hayes at Coweta at Hattie Summers' cafe and beer tavern the night of 12 December, 1953, and also saw the defendant, and defendant showed a chromium-plated, pearl-handled .45 calibre automatic pistol to several colored persons. The pearl handle was studded with jewels.

Deputy sheriff Orcutt remembered seeing both the defendant and Hayes at Hattie Summers' place about 11:00 P. M. the night of 12 December, 1953, and testified that he had to call Hayes down for flashing a half pint of whiskey around.

Later officers located the Hayes Buick and he permitted them to search it. They found an old dress in the car, and expert evidence showed that the piece of cloth that was attached to trailer hitch No. 39 had been torn from that dress. Also some gold chain links were found back of the front seat and frame of the car, shown by experts to bear evidence of being a part of one of the chains Royster was wearing. There was a similarity in the tire treads of the front wheels of the Buick and the plaster casts made at the scene of the death; also plaster casts of shoe heel impressions at the scene of the apparent struggle showed wearing characteristics similar to the wearing characteristics of the shoes defendant was wearing at the time of his subsequent arrest. A specially made wrench from the McCoy Trailer System yard was found under the mat in the turtle back of the Buick, and another special McCoy trailer wrench was found at the garage where Hayes worked.

Hayes when arrested on the 5 January, 1954 was taken to the Tulsa County sheriff's office and assistant county attorney Edmondson talked with him briefly. Hayes admitted that he was in the Coweta community the night of 12 December, 1953, but the next morning when the county attorney asked him about signing a statement, Judge Webb, who had been employed by Hayes' family appeared and after conference with Hayes, Hayes gave a statement but attempted to delineate his movements in Tulsa all of 12 December, 1953.

The defendant Fields on arrival at the sheriff's office at Claremore and in a conversation with officer Houston Johnson denied knowing anything about the Royster murder, but did say that he left Tulsa soon after 6:00 P. M. 12 December, 1953 with Lorenzo Hayes in Hayes' Buick car and that they drove to Hattie Summers' cafe and beer joint in Coweta and also drove to Redbird. He admitted owning a .45 calibre automatic pistol, chromium plated and with pearl handle and jewel inserts. At the time of his arrest defendant's pistol had been left with a colored man by the name of Broadnax as security for a $6 loan. This pistol was obtained and sent to the FBI laboratories at Washington, and it was found by the experts that the bullet found at the death scene was fired from the shell also found there, and fired from defendant's .45 calibre automatic.

Defendant on testifying denied that he went with Hayes to Coweta and Redbird on the 12 December, 1953, but said that it was the previous Saturday, 5 December, 1953 when they made the trip. He denied telling deputy Houston Johnson that he was in the Coweta and Redbird communities at the time in question, and said that although the county attorney of Tulsa County questioned him with a stenographer taking down the questions and answers, that he could not read and that he could only sign his name. He admitted signing the statement. In the statement he detailed the movements of Hayes and himself the night of 12 Decem-

ber, 1953 at Coweta and Redbird; admitted seeing the Cowans at Coweta and showing his .45 calibre automatic to them. He showed a remarkable memory for names of streets in Tulsa for a person who could not read, but who fixed the time he was finally placed in a cell at Claremore by saying that he glanced at a clock on the wall.

Defendant claimed that his automatic had been left with one Myrt Benson for security for $4 his room-mate, T. C. Counters, a Frisco train porter, owed her, and that on the 12 December, 1953 he gave her the $4 that Counters owed her, but she said there was fifty cents interest, so that some days later Counters paid the fifty cents and picked up the pistol. He did not know the date thereafter.

Defendant claimed that he went home with Bertha Bradford 12 December, 1953 and drank and played cards with her until 2:00 A. M., and then went home and to bed. Asked if he was married, he said: "Not personally married, I got a common law wife." But he said Bertha Bradford was not his common-law wife.

Counters on rebuttal said that he got the Fields gun back either the last part of November or the first part of December. He was sure it was prior to the 12 December, because on that date he was out on his run as porter on the Frisco train, and somewhere in Texas.

Myrt Benson testified that T. C. Counters paid the fifty cents interest and got the .45 calibre automatic from her on 2 December, 1953.

Defendant contended that after the Tulsa officers left him at the Rogers County jail the officers there continued to quiz him, but he denied to them knowing anything about the Royster murder. He claimed that one deputy, whom he later identified as Charles Flint, Jr., slapped his face and hit him in the stomach and then offered him a cigar.

■ Defendant Fields admitted that he was sent to Florida State Penitentiary in 1930 and served time for breaking and entering. When he testified, this was a proper inquiry. Tit. 12 O.S.1951 § 381; LeBlanc v. State, 95 Okl.Cr. 280, 245 P.2d 134.

Charles Flint, Jr., testifying in rebuttal denied defendant's accusation, said he saw the defendant in the back office but that he was only at the sheriff's office the afternoon and night of 7 January, 1954 five or ten minutes, and did not even talk to the defendant, and did not go in the room where he was. That witness was called out on another robbery and murder case, and did not get home until after 2:00 A.M. the 8 January, 1954. He was corroborated in this by two other persons who accompanied him on his trip.

Charles Sherman Crenshaw, colored, testified in rebuttal that at 5:45 P.M. the 12 December, 1953, he saw Fields who tried to get witness to take his '41 Ford and drive to Coweta and Redbird with him, saying that he was going to see if he could make some money. He and defendant had worked for a contractor by the name of Simmons for $1.45 to $1.55 per hour, as laborers.

Bertha Bradford swore that defendant went home with her when she closed her cafe the night of 12 December, 1953, and stayed there until 2:00 A.M., drinking and playing cards. Defendant had so testified. She said she knew it was the 12th, because the next morning she read about the Royster killing in the Tulsa World.

In rebuttal Troy Gordon, reporter for the Tulsa World, testified that the deadline for his paper was 1:00 A.M., and that the news item in question appeared for the first time in the Tulsa World on Monday morning, 14 December, 1953.

Robert Gilkie testified in substance that Roscoe Cowan was with him and Columbus Barnes the most of the evening of the 12 December, and that he, Barnes and Roscoe drove to Alsuma and then to Coweta, arriving about 10:30 P.M. He was corroborated by Columbus Barnes. He admitted on cross-examination that his wife and Lorenzo Hayes were cousins.

In rebuttal Roscoe Cowan admitted that at one time he did accompany Gilkie and Barnes to Alsuma and Coweta, but stated that it was prior to the weekend of the 12 December, and that he estimated that it was the 5 December. That on the 12 De-

cember he saw both defendant Fields and Lorenzo Hayes at Hattie Summers' place at Coweta; that he was there from about 7:30 until 11:00 P.M.; that he was positive as to the date because the next morning, which was Sunday, he heard about the body of Vol Dale Royster being found near Coweta; that he heard it over the radio around 12:00 o'clock noon.

Lorenzo Alfonso Hayes testified for the defendant, denied that he and Fields went to Coweta and Redbird the 12 December, 1953, but said that it was on the 5 December. He first said that he fixed the date by the fact that it was right after he got out of the hospital. His counsel revealed some alarm by this answer, and he then said he wanted to change that statement, because he remembered the date by the fact that it was the day after he moved to a new address. He claimed that he drove to get his wife and aunt at Sid Lazarus' home where they worked on 12 December; that prior to this he went by Mrs. Julia Cruze's home and worked on her car for about an hour, leaving there he drove to the Lazarus home about 7 o'clock; that he and his wife had dinner with his aunt, Rosie Orange, at his aunt's home; that he got sick and he and his wife then drove home and he went to bed and did not leave again that night. He made no denial or explanation of the cloth, chain links and wrench found in his car.

Nathaniel Cowan testified that he knew both defendant Fields and Hayes; that Roscoe Cowan was his brother and R. H. Cowan his father; that he worked at the Domestic Laundry, Tulsa; that he came by Lorenzo Hayes' home one Saturday evening about 8 o'clock and Lorenzo and his wife were there; that witness was on his way to the picture show; that he was not out of Tulsa that evening. He was specifically asked if that was the 12 December, 1953. He answered: "Well, I don't know whether it was on the 12th or not, but it was right after Hayes had come out of the hospital." He said he did not know when Hayes got out of the hospital.

Mrs. Gwin Miles testified that she was record room clerk at the Hillcrest Medical Center, Tulsa. She identified the hospital record of Lorenzo Hayes, and testified that he was received in the hospital at 2:15 A.M. 8 December, 1953, and was discharged the 10 December, at 7:30 P.M.

Defense counsel call attention to the fact that Dryden Orcutt testified that when he saw the defendant Fields in Hattie Summers' place at Coweta the night of 12 December, 1953 he had on paratrooper shoes with eight-inch tops, whereas all the other evidence showed that defendant had on just ordinary low-cut shoes, and that the plaster casts were made of the low-cut shoes and compared with the plaster casts made of shoe heel impressions in the sandy loam at the scene of the murder. They are correct as to this discrepancy, and no doubt argued the matter to the jury as going to the credibility of the testimony of that witness.

Counsel argue that no person in his right mind would, if he had only a short distance away and a short time prior shot and killed a person, display his weapon to other persons. Counsel in brief say: "This is too silly and fantastic to believe. If this is true, then counsel for defendant should have pleaded their client 'not guilty by reason of insanity' ". That is a reasonable argument and was probably made to the jury. That was a matter for the jury to consider. Seeking rational explanations to account for what people will do at times, is not easy. There are imponderables.

But aside from this inquiry, who can explain in the within case why persons would rob the trailer office, where the prospects of obtaining any appreciable sum were nil, and where but $70 was actually obtained from the office, and around $30 from the deceased, crimes for which if apprehension made and conviction had, the thieves probably would have received only light punishment, but where they go on and kidnap the victim, drive him to the country and murder him, thus risking a death sentence? It would seem the later acts were wholly unnecessary and by reason of the gravity doubled the efforts of the officers in apprehending the perpetrators. Sometimes criminals are prompted in taking very great risks by reason of previous unsolved crimes, and we are persuaded that particularly is this

true among persons of a low mentality or with warped thinking, where life does not carry a very high value and means only the daily satisfying of the appetite. Often no logical explanation may be apparent.

However, in the within case, the jury had for consideration the testimony of Truman D. McCoy, the trailer lot operator, that when he arrived back at the lot that Saturday evening, in addition to finding the desk drawer broken open and his plastic money box gone, he found a number of trailers on the lot as where customers brought them back, unhooked them and left. These were all accounted for by contracts, but there was another trailer out of line as if someone had started to rent it, certain tools were gone that were subsequently found in Hayes' car and at the shop where he worked. Royster knew Hayes, but did not know defendant Fields. The jury might have reasoned that Fields drove in ostensibly to rent a trailer while Hayes may have walked in to rob the office during the time Fields would be engaged in dickering for a trailer; that in some manner Royster became suspicious and discovered Hayes and then by reason of sure identification, Royster was taken away, and it was some time before Hayes and Fields could decide what to do.

There was evidence of drinking liquor commenced early. There was the possibility that this continued. Such has been known to remove all inhibitions, and with grievous consequences ensuing.

▮ At all events, it is not our task to weigh the evidence or speculate on the reasoning of the jury. That was for the jury. We were merely exploring points that were possibly considered in their deliberations in our determination of whether there was basis in the evidence to support the verdict reached. The brief summary of the high points in the evidence to which we have called attention, we find sufficiently demonstrates that there was ample evidence, where believed by the jury, to support the verdict entered.

Counsel in their next proposition assert: "The admission of the purported statement of the defendant in error, over the strenuous objection of defendant, was highly irregular, far-fetched and prejudical, especially is this true in the light of the background that had already transpired."

This proposition presents the most serious question in the case. It is argued that the delay in arraignment and particularly the act of the officers in requiring defendant to stay overnight and most of the next day in the Rogers County jail was sufficient to vitiate any alleged statement made by Fields to officer Houston Johnson; that the slapping of defendant by officer Charles Flint, Jr., brings this case within the principles announced by this court in Benton v. State, 86 Okl.Cr. 137, 190 P.2d 168 and by the Supreme Court of the United States in Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, and in Ward v. State of Texas, 316 U.S. 547–555, 62 S.Ct. 1139, 86 L.Ed. 1663.

And it is urged that the question and answer statement taken down in shorthand, later transcribed and then signed by defendant was inadmissible by reason of the previous treatment of the prisoner and by the further reason that he was not represented by counsel at the time. Cited also are the cases of Sutton v. State, 35 Okl.Cr. 263, 250 P. 930, and Polk v. State, 26 Okl.Cr. 283, 224 P. 194.

A reading of the facts in the cases cited will reveal that they are not in point in the within case. In the Benton case a fake mob scene was staged, and after prolonged questioning and further demonstrations, and after the defendant thought he was about to be mobbed, he told the officers that although he was not guilty, that he would confess if after they caught the real murderer they would see that he got out of the penitentiary. The officers promised so to do. This court held the confession to have been coerced.

In the Chambers case the defendant was questioned for five days, then at the end of an all-night session the prisoner was led to believe that he was about to be mobbed. The United States Supreme Court held the confession was coerced.

In the Ward case prisoner was arrested by an officer in a county where the officer did not have jurisdiction and was transport-

ed to a county 100 miles away, and then transported from place to place for three days on the excuse of escaping mobs, and prisoner was whipped, beaten and burned. He confessed. The Supreme Court of the United States held the confession coerced.

In Sutton v. State, supra, the defendant was left in jail one month before arraignment, was not permitted to see a lawyer, or relatives and friends. It was held that the confession obtained was coerced.

In Polk v. State, supra, the prisoner was 19 years of age, was told by officers that if he would plead guilty they would see that he was pardoned. He was not allowed a lawyer and the trial court did not advise him of his constitutional right to be represented by counsel until after he had entered his plea of guilty and had been sentenced. He had not waived his right to be represented by counsel.

In the within case, while no confession or confessions were involved, there was involved very material statements alleged to have been made by the defendant Fields. The first was in a brief conversation between the defendant Fields and officer Houston Johnson on reaching the sheriff's office at Claremore. There was no contention that this statement was coerced. Defendant merely state something he apparently knew could be proven by evidence of a number of Negroes with whom he had become acquainted, and being that on the evening and night of 12 December, 1953, he and co-defendant Hayes were in the Coweta and Redbird area.

While defendant contended that after Johnson and accompanying deputy left him with the Claremore officers that they continued to question him and one officer slapped his face and hit him in the stomach, he never made any statement to the Claremore officers except to deny any knowledge of the murder of Vol Dale Royster, and no purported statement to the Claremore officers was attempted to be introduced. Also there was overwhelming evidence that the Claremore officer defendant alleges mistreated him was never close enough to defendant to have slapped him.

There was no contention by defendant that the county attorney and Tulsa officers mistreated him, threatened him or promised him anything when he was asked if he wanted to repeat what he had told officer Johnson and have it put in writing by a reporter.

■■ The court in the absence of the jury heard evidence from both the officers and from the defendant concerning these statements, and decided that the statements were voluntary. In Coleman v. State, 70 Okl.Cr. 246, 104 P.2d 1004, 105 P.2d 431, paragraph three of the syllabus, this court, speaking through Barefoot, J., said:

"The fact that a defendant was under arrest and in jail and was not warned that any statement made by him might be used against him, will not affect the admissibility of any voluntary statement made by him which would otherwise be competent."

The trial court also submitted to the jury the question as to whether or not the statements in question were voluntarily made, and advised the jury that only voluntary statements could be considered.

The Attorney General in answer brief cited the case of Lyons v. State, 77 Okl.Cr. 197, 138 P.2d 142, 144, 140 P.2d 248, which in reply brief defendant contends is not applicable to this case. As we understand, the position of the State is that even if the defendant was slapped and then hit in the stomach by a Claremore deputy that such happened after he made a voluntary statement to deputy Houston Johnson and long prior to the time he voluntarily answered interrogatories propounded by the county attorney and taken down by the court reporter. No contention was made that Houston Johnson or the county attorney coerced or threatened or promised defendant anything. In fact, the very statements at the commencement of the questioning and which defendant admitted signing refutes such idea.

■■ In the Lyons case, supra, there was a confession admittedly coerced by a deputy, but thereafter a voluntary confession was made to other parties. See paragraphs 7 and 8 of the syllabus, reading:

"The general rule is that where **a** confession has been obtained in such a manner as to come within the terms of an involuntary confession, any statement made by accused while under that influence is inadmissible. However, a voluntary confession thereafter made is not affected by the fact that a previous one was obtained by improper means if it is shown that these influences are not operating when the later confession is made.

"The presumption that a subsequent confession of the same crime flows from the same improper influences which induced a prior confession is not a conclusive one and may be overcome by proof that the influences present at the prior confession did not operate on the second or subsequent confessions."

See also Fry v. State, 78 Okl.Cr. 299, 147 P.2d 803; Jackson v. State, 29 Okl.Cr. 429, 234 P. 228; Strong v. State, 46 Okl.Cr. 167, 287 P. 1091; Jones v. State, 77 Okl.Cr. 285, 141 P.2d 109.

In reply brief counsel for the defendant say that if the Lyons case had been appealed to the Supreme Court of the United States the case would have been decided differently. It so happens that this case was appealed to that court, and was affirmed. It is reported in 322 U.S. 596–607, 64 S.Ct. 1208, 88 L.Ed. 1481.

It should be kept in mind that the first ten amendments to the Constitution of the United States apply only to Federal courts and not to State courts. See Maxwell v. Dow, 176 U.S. 581, 20 S.Ct. 448, 451, 44 L.Ed. 597, 599, where the Supreme Court of the United States through Justice Peckham said: "In order to limit the powers which it was feared might be claimed or exercised by the Federal government, under the provisions of the Constitution as it was then adopted, the first ten amendments to that instrument were proposed to the legislatures of the several states by the first Congress on the 25th of September, 1789. They were intended as restraints and limitations upon the powers of the general government, and were not intended to and did not have any effect upon the powers of the respective states."

We have treated this matter at some length in Hendrickson v. State, 93 Okl.Cr. 379, 229 P.2d 196, 197. And there we said in paragraph two of the syllabus:

"The inquiry in this jurisdiction is as to the truthfulness and reliability of the confession made, and delay in arraignment does not ipso facto vitiate a confession, but if there is a question of such delay having brought about the confession, then the jury may by proper instruction be required to consider such delay in determining whether or not the confession was coerced."

And in the body of the opinion we said:

"This court throughout its history has not hesitated to reverse cases where the procedural rules established have been violated. A late case is that of Benton v. State, 1948, 86 Okl.Cr. 137, 190 P.2d 168. In that case and in Lyons v. State, supra, this court has warned officers concerning their conduct toward prisoners, particularly as such would affect the admissibility of confessions under the voluntary-trustworthy test prevailing in our state courts. A reference to Shives' Criminal Digest or the Oklahoma Digest will disclose a long line of cases where this court reversed convictions and bottomed on the conduct of the officers, where by reason of coercion or promise in obtaining confessions the same were deemed unreliable."

We conclude that the trial court correctly admitted in evidence the written statement of the defendant, as well as the voluntary statement made to officer Houston Johnson.

 It is next complained: "The court erred in permitting a stereoptican picture slide to be shown in the darkened court room before the jury depicting the scene of the tragedy * * *."

It is then claimed that the State had already introduced pictures of the murder scene which had been viewed by each member of the jury panel. It is argued that the slide was shown for the purpose of creating prejudice.

The record in the case shows that the colored slide was marked State's Exhibit

No. 12, and was introduced into evidence prior to the introduction of a number of other photographs. It is not contended that the slide did not constitute an accurate representation of the scene. The record supports the court in admitting this slide. Cooper v. State, 61 Okl.Cr. 318, 67 P.2d 981; Jackson v. State, 67 Okl.Cr. 422, 94 P.2d 851.

We note the following in the record concerning the admission of the slide:

"Mr. Simms [Assistant County Attorney]: We will offer in evidence State's Exhibit No. 12.

"Mr. Webb: Oh, I have no objection, I don't know anything about it.

"Mr. Franklin: We don't think the proper foundation has been laid, but we have absolutely no objection to them proving where the body was found, who found it, and the pictures taken, we are not going to object to those kind of things.

"The Court: Well, if there is no objection, it may be admitted."

After this one of counsel changed his mind and entered an objection "for the purpose of the record". We hold that the objection came too late, and the colored slide being the first picture introduced showing the victim of the murder at the scene, we do not find that the court abused its discretion in admitting the same in evidence.

It is next contended: "The court committed numerous reversible errors of law by admission of testimony offered by the State to which defendant excepted and still excepts."

As already stated, we have carefully read the entire record and fail to discover "numerous reversible errors of law". So we shall consider only the specific errors complained of.

■■■ The testimony of Houston Johnson with reference to records of the McCoy Trailer System is called to our attention. Johnson was testifying as to how he came to be looking for the Buick with a specific tag number, owned by Lorenzo Hayes, and

as to how he connected Hayes and Fields with the murder. He checked certain records in the McCoy office, discovered the Hayes contract, State's Exhibit No. 50. We would point out that the records in question had previously been identified by Mr. McCoy and if Johnson was permitted to testify beyond his knowledge as to the records in question, such error was harmless in view of the previous identification by Mr. McCoy.

The final proposition raised is: "We think the court should have sustained our motion in arrest of judgment on the ground that the jury conducted prayer service during their deliberations. This was in no sense an effort to impeach the verdict of the jury. They told it themselves, that they had conducted these services and that information was published in the local papers."

In the first instance, we find that there is no evidence in the record to support the proposition advanced. There was a motion and later a statement of counsel that the foreman of the jury "if he were subpoenaed to testify" would state that a prayer service had been held. By reason of the absence of a record the proposition is not deserving of treatment. See Lee v. United States, 7 Okl. 558, 54 P. 792; Black v. State, 3 Okl.Cr. 547, 107 P. 524; Starr v. State, 5 Okl.Cr. 440, 115 P. 356; Sweet v. State, 70 Okl.Cr. 443, 107 P.2d 817. However, the contention is so astonishing that we shall give it notice.

■■■■ In the case of Grable v. State, 1935, 60 Okl.Cr. 339, 44 P.2d 152 this court held, in paragraph 2 of the syllabus:

"Under the provisions of Section 3081 O.S.1931 [now Tit. 22 O.S.1951 § 857], it is reversible error for the bailiff to enter a jury room and have a conversation with the jury and offer a word of prayer in the jury room in the presence of the jurors prior to the time that the jury has returned its verdict into open court."

It was not the prayer as such that caused the reversal, but the very fact of a third person entering the jury room and conversing with the jury prior to the time the jury

454

returned its verdict into open court and thus violated the statutory provisions. See Lowrey v. State, 87 Okl.Cr. 313, 197 P.2d 637; also Green v. State, Okl.Cr., 281 P.2d 200.

The essence of prayer is love. To truly pray is to put aside selfishness and think of others. Coleridge said: "He prayeth best who loveth best". To pray is to come closer to God, for we are told that "God is Love". I John 4:16.

The function of the jury was to ferret out from the evidence produced the truth of the matters then under study, as best they might. They had the instructions of the court as to the law of the case. But their great problem was in determining and evaluating the facts from what they had before them. There was need that their minds, their every faculty, should function at the highest efficiency. Surely a mind turned in humility and love toward the Creator would come nearer being freed from prejudice and function with greater deliberation than otherwise would be the case.

We find no error in the conduct of the jury in tempering their deliberations with prayer. Their example emulated the world over by all classes of persons would make this a better world in which to live, as love is the antithesis of hate.

Convinced as we are of the sufficiency of the evidence to support the verdict of the jury finding the defendant guilty of murder, we come to consider the punishment assessed. Another jury while finding codefendant Hayes guilty of murder, assessed the penalty at life imprisonment. As reiterated by Judge Doyle in Mays v. State, 19 Okl.Cr. 102, 197 P. 1064, 1071:

" 'The most solemn and momentous duty courts are called upon to perform in the administration of the criminal law is to inflict the death penalty, and it should be inflicted only in extreme cases, when no other punishment will vindicate the law and protect society against the totally depraved. How careful, then, should we be in reviewing a capital conviction, before we lend our sanction to the taking away of that which, when taken away, we cannot restore.' "

Herein the extreme penalty has been assessed solely on circumstantial evidence. If the defendant had been observed at the McCoy Trailer System, 1321 North Peoria, Tulsa, around six or seven o'clock 12 December, 1953, or if defendant and accomplice had been seen with a white man as a passenger in the Hayes Buick car at any point between six and eight-thirty the night of the murder, or if the defendant or his accomplice had even confessed to any dealings with the deceased the night of the murder, we would not hesitate in approving the extreme penalty assessed.

By reason of the thoughts expressed, and by virtue of authority granted by Tit. 22 O.S.1951 § 1066, we are of the opinion that justice requires a modification of the judgment and sentence of death to that of imprisonment for life at hard labor in the State Penitentiary.

The judgment and sentence of the district court of Tulsa County herein is so modified, and as thus modified, is affirmed.

JONES, P. J., and BRETT, J., concur