ELLIOTT HICKS v. STATE.

No. A-9676.   Sept. 25, 1940.

(106 P. 2d 136.)

H. A. Johnson, of Perry, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and W. Hendrix Wolf, Co. Atty., of Jay, for defendant in error.

JONES, J. The defendant Elliott Hicks was charged in the district court of Delaware county with the offense of murder, was tried, convicted of manslaughter in the second degree, and sentenced to serve a term of four years in the state penitentiary, and has appealed to this court.

The charging part of the information is as follows:

"Said defendant then and there being did then and there willfully, unlawfully, feloniously and premeditately, and with a premeditated design then and there existing in the mind of him, the said Elliott Hicks, to effect the death of Lydia Hicks, made an assault in and upon the said Lydia Hicks with his feet and hands, and did strike, hit and beat and kick the said Lydia Hicks, on and about the body and did then and there and thereby inflict certain dangerous and mortal wounds in and upon the body of the said Lydia Hicks, of which mortal wounds so inflicted, as aforesaid, the said Lydia Hicks did die, as was intended by the said Elliott Hicks she should do, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the state."

The proof against the defendant was wholly circumstantial, and the only assignment of error before this court is that the circumstantial evidence was wholly insufficient to sustain the conviction.

The defendant and the deceased were married on January 26, 1918. At the time of the occurrence out of which the charge herein arose, the parties were living near the village of Rose, in the hills of Delaware county. The defendant owned about ten acres of land which had two shacks upon it. The defendant and the deceased had five children living at the time of the death of the deceased on February 12, 1938. The oldest daughter, Susie, was married and lived up the hill from the shack in which the deceased and the four younger children were living. The defendant for two years prior to the alleged homicide had been away from home most of the time. When he was in Delaware county he slept at the cabin where his daughter, Susie David, lived. The deceased had made application for relief and was receiving $20 a month for herself and four minor children.

In 1937 the deceased had charged the defendant with beating her, but this offense was dismissed upon payment of the costs by the defendant.

Early in the evening of February 12, 1938, the defendant had lain down on the bed at the lower cabin and gone to sleep; his wife Lydia, the deceased, took their twelve-year-old daughter, Lucille, to the upper cabin, and there had gone to bed, leaving the three younger children at home with the defendant. The defendant awakened and followed them. It was dark in the room. According to Lucille, he put his hand on his wife and told her "to go on down where the kids were." He spanked Lucille for having left the children and sent her on ahead. She heard her father call to her, but did not understand what he said. Soon after she had reached home and gotten in bed, her father came and told her to get some of the neighbors, that her mother had fallen. The defendant got some water and had a younger daughter take him back to where his wife was. Lucille went for Mr. and Mrs. Miller, Mr. and Mrs. Taylor, and Mrs. Morgan, who were neighbors, and they accompanied her to where her mother was. The deceased was lying on the path about halfway between her home and that of her daughter, near the top of the hill. She was unconscious, but still alive. They carried her to her daughter's and put her in bed. They gave her first aid by rubbing her and putting hot rocks around her. She was dead when the doctor arrived, and it was too dark for him to make an examination. The next day her body was carried to Pryor for examination.

Dr. J. W. Prowell, the family physician who examined the deceased, testified that he had treated her for female trouble and given her some medicine for heart trouble that was "chronic in a way," but under favorable conditions he couldn't say that "she was in any danger from that." In his examination he did not find "any external bruises or abrasions, but around the neck, back of the neck, and down the back was blue," and was of the opinion that

"the bluing of the skin would be more apt to show where they died under heart conditions, than in any other trouble." He was unable to determine the cause of her death.

Dr. V. D. Herrington made an autopsy of the deceased the following day. He stated there was a brush burn "right back, extending about midway of the calf of the leg to about the middle of the thigh; a bruise on the large muscle of the left arm and dislocation of the left shoulder; a bruised place under the costal margin of the ribs on the left side, about the end of the 12th rib." He had opened the abdominal cavity and found it full of blood, and found the cause of bleeding to be from a rupture of the spleen located under the tenth, eleventh and twelfth ribs on the left side. The spleen has a tough, hard membrane covering it, which had been torn off and caused the bleeding. In his opinion her death was caused by "shock and loss of blood." That the spleen was ruptured by an external blow of considerable force; but he did not have an opinion as to whether the condition was caused by a blow or by falling; however, a kick that ruptured the spleen would cause death in a person who did not have a weak heart; that she did not have a bad heart or she would not have lived as long as she did. The direct cause of death was shock and loss of blood, to the exclusion of heart trouble. He described the discoloration near the ribs, which he stated had a definite outline which caused him to think it had been caused by a severe blow from some external force. That the injury to her side ranged inward and upward slightly. The blow which ruptured the spleen came from below it and had to range upward in order to get up under the edge of the ovaries. That it would take a considerable blow to rupture the spleen and dislocate the shoulder of the deceased who was a fairly large woman

of about 145 pounds. That the deceased could not have received the injuries which he found on her body by falling forward.

H. W. Green, the undertaker, corroborates Dr. Herrington as to the external location of the bruises.

The state offered testimony from the neighbors that the defendant and the deceased had not been living together for a long time; that the defendant did not support his wife and children; that the deceased worked as a field hand; that they had never heard of her having fainting spells. They also testified to statements of the defendant concerning the manner in which the deceased was killed, which were materially different from the testimony of the defendant herein.

There was a conflict of testimony as to whether or not there were any large rocks at the place where the deceased fell.

The defendant introduced testimony that the deceased had heart trouble and was subject to fainting spells; that the defendant gave his wife every cent he could make; that the defendant and deceased were living together, but that the defendant spent most of the nights at his daughter's house. The defendant said it was because his wife received relief for dependents; his daughter said it was because it was so cold, and that he slept on a feather bed that she had there.

The defendant testified in his own behalf that his eyes were so bad that he could not see after dark. On the way home his wife had been a few feet in front of him. They had been walking slowly. His wife told him she had had a letter from her mother and Mary. He told her she had been a long time telling him about it. The deceased disappeared from his view. She had fallen.

The defendant attempted to show that the deceased's dislocated shoulder and ruptured spleen were caused by driving the body over the rough roads to Pryor. There is confusion in the testimony as to how the deceased fell. The defendant says that he had moved her a short distance before the neighbors got there.

Section 2228, O. S. 1931, 21 Okla. St. Ann. § 716, reads as follows:

"Every killing of one human being by the act, procurement or culpable negligence of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

This court stated in Melton v. State, 57 Okla. Cr. 57, 47 P. 2d 195:

"Convictions can be reversed as not supported by evidence only if no substantial evidence tends to show guilt, or evidence is so insufficient that jury must have acted from partiality, passion, or prejudice."

In Pickett v. State, 35 Okla. Cr. 60, 248 P. 352, it was held:

"Where the evidence and the reasonable and logical inferences and deductions to be drawn from it are sufficient to convince the jury beyond a reasonable doubt of the guilt of a defendant, this court will not disturb the verdict for insufficiency."

This court held in Parks v. State, 18 Okla. Cr. 277, 194 P. 281:

"It is only when there is no substantial evidence to support the verdict that the appellate court will reverse on the ground of insufficient evidence."

The rule repeatedly announced by this court is that it has no power to reverse a judgment of conviction upon the ground that the verdict is not supported by the evidence, unless there is no substantial evidence tending to show the guilt of the defendant, or the evidence fails so

far to support the verdict that the necessary inference is that the jury must have acted from partiality, passion or prejudice. Underwood v. State, 36 Okla. Cr. 21, 251 P. 507.

Under the rule in Oklahoma where circumstantial evidence is relied upon for conviction, the circumstances proved must not only be consistent with each other, but consistent with the defendant's guilt and inconsistent with any other reasonable hypothesis other than his guilt. Mahaffey v. State, 44 Okla. Cr. 29, 279 P. 704; Lemke v. State, 33 Okla. Cr. 34, 241 P. 832; Davis v. State, 32 Okla. Cr. 436, 241 P. 500.

The defendant contends that under this rule the facts point just as strongly to the innocence of the defendant as towards his guilt. With this contention we cannot agree. The physical facts surrounding the death of the deceased differ so materially from the defendant's statements as to how the death occurred that the jury was fully justified in reaching the conclusion that the wife of the defendant came to her death from a blow delivered by the defendant. It is hard for any reasonable man to reach the conclusion that the injuries found on the body of deceased could have been sustained merely by slumping forward in a faint as she was walking down the path towards her home. Even conceding for the purpose of argument that the path was full of large rocks, which fact is disputed under the evidence, it would have been difficult for the deceased to fall in such a position as to receive the blows which ruptured her spleen, and caused the discoloration on her left side and back.

The defendant stated that his wife fell forward. Under the testimony of Dr. Herrington, it would have been impossible for her to receive the blow which caused her death by falling forward.

292

The testimony tends to show that the relationship between the defendant and the deceased was not very pleasant, and his demeanor just prior to the time the injuries occurred to the deceased indicates that he was angry with the deceased and his daughter.

This court held in Tallon v. State, 22 Okla. Cr. 89, 210 P. 309:

"Evidence of the actions, conduct, and general demeanor of defendant a short time prior to the commission of the homicide is competent as tending to show the state of mind of defendant at the time of the killing."

See, also, Inman v. State, 22 Okla. Cr. 161, 210 P. 742.

The jury, no doubt, took into consideration the fact that the evidence against the defendant was entirely circumstantial in arriving at their verdict, because the evidence would have justified a verdict of manslaughter in the first degree with a more severe punishment imposed.

No material error appearing in the record, the judgment of the district court of Delaware county is hereby affirmed.

DOYLE, P. J., and BAREFOOT, J., concur.