Oliver Joy BROADWAY, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–16144.

Court of Criminal Appeals of Oklahoma.

Feb. 16, 1972.

Rehearing Denied March 16, 1972.

Charles W. Stubbs, Oklahoma City, for plaintiff in error.

Larry Derryberry, Atty. Gen., Raymond Naifeh, Asst. Atty. Gen., for defendant in error.

## OPINION

SIMMS, Judge.

Plaintiff in error, Oliver Joy Broadway, hereinafter referred to as the defendant, was convicted in the District Court of Oklahoma County, Oklahoma, by jury verdict of the crime of Murder and his punishment fixed at Life. Judgment and sentence was imposed on the 28th day of April, 1970, and this appeal perfected therefrom.

The evidence of the state was wholly circumstantial in nature; therefore, a recitation of the evidence presented at trial is necessary for the determination of this appeal.

The transcript shows that defendant received a telephone call from his divorced wife, Rhetta Broadway, the victim of the homicide, at approximately 2:30 p.m. on April 24, 1969, concerning the payment by defendant to deceased of child support. According to the testimony of a witness, defendant was observed standing near the trunk of his 1967 Mustang automobile, parked in the driveway of deceased's home at 4:45 p.m., the day of the killing. Defendant was observed carrying a screwdriver in his rear pocket and had a small trickle of blood on his right forearm. He told the witness that he was waiting for the deceased to give her a check. It should also be noted that at the time, the defendant had dust on the front of his trousers.

Harry William "Rusty" Minick, age fifteen (15), natural son of the deceased and former stepson of the defendant, testified he left school at 3:30 on the afternoon in question, went to his grandmother's home, and called his mother at 4:00 p.m. Arrangements were made during the telephone conversation for his mother to go to her home, the scene of the homicide, after she had left work, change clothes, and pick up the witness at his grandmother's home at 5:30 p.m. The deceased was to take her sister to the airport in Oklahoma City for the sister's return flight to California.

Evidence further shows that near 6:00 in the evening, Rhetta Broadway had not arrived at her mother's as per previous arrangements, and her mother and daughter drove to the home of deceased where they observed Rhetta's car in the driveway and discovered the front door to the house to be locked. They thereafter went to the back of the house, found the back door locked, and observed a broken window glass. The grandmother and daughter returned to the grandmother's home, informed deceased's fifteen-year-old son of the situation and the boy immediately notified the Oklahoma City Police Department.

Harry William Minick had a friend drive him to the home of his mother and they met the police outside the home. He also found the front door to be locked, the back storm door locked, and a window to the right of the back door broken. The officers subsequently removed the front screen while Harry Minick unlocked the front door with a key and started into the house with the officers.

Harry Minick observed his mother lying face down in the hallway of the house. The hallway walls were covered with blood.

Officer Ronald G. Calvery of the Oklahoma City Police Department testified he met Harry William Minick at the location of the homicide, talked with him, then went to the rear of the house. He observed holes had been punched into the screen, the screen pried loose, and the window, covered by an unlatched screen was broken in the lower left hand corner. Officer Calvery returned to the front of the house and removed the front storm door. The boy unlocked the front door and they entered the house.

It was the further testimony of Officer Calvery that upon entering the home, he observed the hallway covered with blood and body matter, and observed a body lying face down with the upper portion of the head removed. The officer heard a groan, went down the hallway and saw the defendant lying with his head in the doorway of the kitchen, face down. Officer Calvery turned the defendant over and observed a red substance and body matter on the right shoulder of his shirt. The officer observed an icebox placed in front of the kitchen door and broken glass on the kitchen floor.

A search of the defendant for identification by the officer revealed five (5) live .12-gauge shotgun shells in defendant's right front pocket, and two (2) more unexpended .12-gauge shotgun shells in defendant's left front pants pocket. Observation disclosed the telephone wires inside the house had been severed, and an empty .12-gauge shotgun shell was lying on the floor near the right foot of the deceased.

Officer Bill L. Hooten, with the homicide division of the Oklahoma City Police Department, testified as to observing pill bottles on the dining room table, and a sawed-off Winchester .12-gauge shotgun lying on a bed in one of the bedrooms. The gun barrel had a red substance on it resembling blood. Officer Hooten lifted a sample of carpet from the area where Mrs. Broadway's body had been lying and found buckshot in the carpet padding. He also discovered buckshot in the ceiling directly above the location of the body of the deceased. He found a second expended .12-gauge shotgun shell behind a trash can located in the southeast bedroom of the structure. An empty Scotch whiskey bottle was found in the same bedroom, setting on the dresser. The officer located defendant's automobile one block west of the scene of the homicide. Hooten testified the deceased was found with her shoes on, while defendant was wearing no shoes at the time Hooten arrived. Blood stains were observed by the officer on the bottom of the trousers worn by defendant and there were spots of blood on the defendant's shirt.

An autopsy was performed on Rhetta Broadway on April 25, 1969, and it revealed two shotgun wounds in the left side of the head. One wound, in the opinion of the pathologist, was a "contact" wound. Blood was analyzed for alcohol and found to be negative.

Further evidence adduced by the state shows two un-fired shells remained in the shotgun found at the scene. No fingerprints could be found on the weapon because of an oily substance adhering to the shotgun, and because the shotgun shells were ridged or corrugated, no latent prints could be obtained therefrom.

Defendant interposed the defense of insanity and in support of his theory of defense, called as witnesses, a number of hospital employees from Baptist Memorial Hospital, where defendant was taken from

the scene. They all testified that at the times they observed the defendant, following the shooting, defendant was incoherent and had to be restrained. Defendant was later, pursuant to order of court, taken to Central State Hospital at Norman, Oklahoma, for observation; and employees at that facility testified that when defendant was first admitted, he was incoherent, confused, had no control over himself, and was not oriented for a period of five to six days.

Moorman Prosser, M.D., specializing in psychiatry and neurology, testified in behalf of the defendant. Dr. Prosser related that he first saw defendant on November 18, 1968, and was of the professional opinion that defendant was suffering from a schizophrenic type of disorder with paranoiac features and had been for a period of time. Dr. Prosser commenced treatment but did not achieve the desired progress and had defendant hospitalized in January, 1969. Defendant later checked into a Veteran's Administration Hospital, stayed four days, and left against medical advice.

Dr. Prosser saw defendant on April 26, 1969, or, two days following the shooting, at the hospital in Oklahoma City, and found defendant to be in a semi-comatose condition, suffering also from convulsions. The expert witness was of the opinion, and so testified, that at the time of the alleged offense, the defendant did not know right from wrong and was insane. He also testified the defendant's physical and mental condition at the time he was found in the home of the deceased resulted from an overdose of drugs and alcoholic intoxication.

Several witnesses were called by defense to attest as to the good character of defendant.

The defendant took the stand to testify in his own defense. Oliver Joy Broadway related that on the day of the homicide, he did go to the home of deceased a little after 4:00 on the afternoon in question in response to a call he had received from his former wife, Rhetta. He pulled into the driveway at Rhetta's house, obtained a screwdriver from the trunk of his Mustang and attempted to adjust the idler on the carburetor. Rhetta later arrived in her Chevrolet and parked it behind defendant's car in the driveway. They entered the house together, and he intended to give her a check for $200.00 for child support. [It should be noted that this check was found in the billfold of defendant.] Rhetta fixed him a drink of Scotch and it tasted funny. He finished the first drink and asked her to fix him another. He, however, fixed his own second drink, and this was the last he remembered. Defendant testified to ingesting ten tranquilizers on the day of the shooting, and denied ever having seen or having the Winchester shotgun or shotgun shells. He testified he "believed" he didn't shoot his ex-wife.

On cross-examination, defendant testified he didn't know if he had killed his former wife or not.

As their principal rebuttal witness, the state called Loraine Schmidt, M.D., and Psychiatrist at Central State Hospital. Dr. Schmidt first saw defendant on May 13, 1969, and observed him frequently for a period of ninety days. This expert witness related that defendant, while at Central State Hospital, underwent psychological testing, physical examination, and x-ray examination. Dr. Schmidt related to the jury that in the opinion of the witness, defendant was not mentally ill nor psychotic, but suffering from acute drug withdrawal symptoms.

Dr. Schmidt testified that at the time of the offense, defendant "would and could know right from wrong" except for the possible factor of drug and alcohol intake. It was the doctor's opinion that defendant was not psychotic on April 24, 1969, the date of the offense.

Defendant had his initial preliminary hearing before the Honorable Fred V. Otto, Judge of the District Court, Oklahoma County, Oklahoma, on August 13, 1969. Judge Otto found sufficient cause to hold the defendant for trial. Thereafter,

defendant filed a verified motion to quash the indictment [sic] based upon the alleged insufficiency of evidence adduced at the preliminary hearing. On October 13, 1969, Oklahoma County District Judge Charles Owens entered the following order:

"Now on this 13th day of October, 1969, upon the motion to quash the indictment of the defendant herein and for good cause shown, the Court sustains the motion to quash the indictment and finds that case should be remanded for further preliminary hearing.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that said case should be and is hereby remanded for preliminary hearing."

The District Attorney did not file another, or an amended, Information; but again proceeded with a preliminary hearing on November 7, 1969, before the Honorable Jack C. Thorne, Special District Judge for Oklahoma County, on the original Information filed on April 25, 1969, and upon which defendant had a previous preliminary hearing.

█ Defendant takes the position the order above recited and entered by Judge Owens on October 13, 1969, discharged defendant of the offense; that the proper procedures, as set forth in 22 O.S.1969, §§ 499, 500, were not followed and the District Court of Oklahoma County was without a charging vehicle to vest them with jurisdiction to place defendant before a jury or in jeopardy.

Defendant's brief concedes there is no case authority to support his proposition, and the Attorney General is unable to produce any case law directly upon this question. Defendant simply relies upon the wording of the above referred to statutes.

Title 22, O.S.1969, § 499, supra, provides in part that if the motion be granted, "the court must order that the defendant, if in custody, *be discharged therefrom, * * * unless it direct that the case be readmitted to the same or another grand jury."* (Emphasis added)

Title 22, O.S.1961, § 500, supra, provides:

"If the court direct that the case be resubmitted, the defendant, if already in custody, must so remain, * * * to answer a new indictment or information; and unless a new indictment or information is found before the next grand jury of the county is discharged, the court must, on the discharge of such grand jury, make the order prescribed in the preceding section."

This precise issue was treated in Broadway v. Clarence Mills, District Judge, et al., Court of Criminal Appeals No. A–15,762, wherein defendant sought to prohibit his trial in the District Court of Oklahoma County upon these identical grounds. Judge Brett, of this Court, and Former Judge Nix, of this Court, wrote in an "Order Denying Dismissal of Prosecution":

"We further find that the trial court's order of October 13, 1969, remanding the case for preliminary hearing on petitioner's Motion to Quash does not require a dismissal of the case."

This Court, therefore, on February 25, 1970, refused to stay further proceedings pending the filing of a new Information.

State v. Hollis, Okl.Cr., 273 P.2d 459 (1954), stands squarely for the proposition that if the judgment of the trial court quashing or setting aside the information contains an order discharging the defendant, the case as to him is at an end. However, State v. Hollis, supra, goes further to hold that if the defendant be not ordered discharged, the defendant must abide subsequent proceedings in the case in the trial court. The same rule of law may be found in State v. Dennis, 28 Okl.Cr. 312, 230 P. 935; People v. Norman, 9 Mich.App. 647, 158 N.W.2d 38 (1968); Wilk v. State, Fla. App., 217 So.2d 610.

We must therefore conclude that because the order entered by Judge Owens remanding the case for further preliminary hearing did not contain any order discharging the defendant, the filing of a new information was unnecessary.

Brief of defendant next contends denial of his rights to a speedy trial. Again this contention was rejected by this Court in Broadway v. Mills, Judge, supra. Defendant complains, however, that following the order of this Court on February 25, 1970, he was redocketed for trial on the 23rd day of March, 1970, but over his objection, the case was continued for trial until April 13, 1970. In other words, the defendant contends the presence of a jury panel to try his cause constitutes a term of court, and a continuance beyond the period that particular petit jury panel is present, is a violation of a constitutional guarantee.

 "Terms of court," used as a measure to determine if a defendant has received a speedy trial, were legally abolished. It cannot be said each of the district courts of the State of Oklahoma may establish their own so-called "terms of court" simply by the impanelling of a petit jury. The issue of speedy trial is discussed in Coggins v. Shumate, Okl.Cr., 401 P.2d 995 (1965), wherein this Court held:

> "Generally speaking, a 'speedy trial' is one conducted according to prevailing rules, regulations, and proceedings of law free from arbitrary, vexatious and oppressive delays. The right does not require a trial immediately upon arrest, or the filing of an indictment or information; but requires that the trial be had as soon as reasonably possible, within the statutory requirements, without depriving the prosecution of a reasonable time to prepare for trial."

*Coggins,* supra, was cited with approval by my learned colleague, Judge Brett, in the most recent opinion of Stucker v. State, Okl.Cr., 493 P.2d 84.

We cannot, in good conscience, say a delay of twenty days to await the return of the State Medical Examiner for purposes of giving material testimony was either arbitrary, vexatious, or oppressive.

Defendant next complains that the trial court erred in not sustaining the motion to suppress the evidence of Officers John Hill, R. McEwen, and J. L. Guinn. It is to be noted that Officer Hill was the only one of the three enumerated in the motion to give testimony at the trial. The record reflects defense counsel attempted to interview the officers in question, whose names were endorsed in the information, but was told, in substance, it would have to be cleared through the District Attorney's office. The District Attorney refused permission for the interview, and no interview transpired. Apparently, defendant brought the problem to the attention of the trial court by the filing of his motion to suppress, four days prior to trial, was refused relief, and specifically notified Judge Owens, the trial judge during the trial of the cause, who correctly observed:

> "I am of the opinion that you are entitled to have the police officers to talk to them about their testimony. * * * But, you are entitled to know the substance of their teestimony. I think I would agree with you there." (Tr. 104–105)

The question then arises, "Does the refusal of a witness endorsed on an information to discuss their testimony, under direction of the prosecuting authority, constitute reversible error?"

 The right of an accused or his counsel to interview a witness was clearly established in Exleton v. State, 30 Okl.Cr. 224, 235 P. 627 (1925), wherein this Court stated:

> "Section 20, Article 2 of the state Constitution provides that, in capital cases at least two days before the case is called for trial, an accused shall be furnished with a list of the witnesses that will be called in chief, together with their post office addresses.

> This Court in the case of State v. Frisbee, 8 Okl.Cr. 406, 127 P. 1091, says that this provision of the Constitution confers a valuable right upon a defendant as it gives him an opportunity to make inquiry as to the character, bias, and antecedent of the witnesses against him, and to learn something of their testimony and thereby better enable him to prepare

for trial. See, also Hisaw v. State, 13 Okl.Cr. 484, 165 P. 636. *Ordinarily it is discretionary with the court whether or not he will order an interview with a witness for the state.*" (Emphasis added)

*Exleton,* supra, has been widely cited for the proposition that although a defendant or his counsel has the right to interview a witness, judicial command to consent to the interview is discretionary and the decision of the trial court relating thereto will not be disturbed absent a clear abuse of discretion.

Emphasis must be attached to the fact that defendant made no formal request of the trial court to order an interview with the officers, but rather sought to suppress their testimony because no interview was in fact accorded him by the witnesses, not the court, nor was there any prohibitory order by the court.

Even where it was conceded or assumed the right of an accused to interview witnesses of the prosecution had been wrongfully denied, the courts have refused to reverse convictions where there was no showing that the accused had been prejudiced by that denial, or where it affirmatively appeared that such prejudice was absent. See, State v. Wise, 101 Ariz. 315, 419 P.2d 342 (1966); Frazier v. State, 142 Miss. 456, 107 So. 674 (1926); State v. Anthoulis (1939) 62 Ohio App. 113, 23 N.E.2d 312; State v. Gaines (1927) 144 Wash. 446, 258 P. 508, error dismissed, 277 U.S. 81, 48 S.Ct. 468, 72 L.Ed. 793, and, Whitehead v. State (1938) 134 Tex.Cr.R. 579, 116 S.W.2d 703.

Officer Hill's testimony given at the trial has been carefully scrutinized to ascertain if same contained any matter prejudicial to defendant's case. Hill identified a number of photographs of the scene which simply were demonstrative of the evidence given by a number of other witnesses. The photographs could have been introduced by other witnesses. Hill's testimony as to finding any latent fingerprints

at the scene was absolutely negative and therefore could not have been prejudicial.

It should be noted the photographs identified by Hill, were, with but few exceptions, introduced into evidence without objection on the part of defendant. The defendant, obviously, suffered no prejudice by reason of his not interviewing witness Hill.

While this Court is of the opinion no error resulted from the officer's refusal to discuss his testimony with defense counsel prior to trial, this should in no way be taken as either condoning or approving the acts of the District Attorney's office or police officers in secreting testimony from defense counsel. To do so flirts with a potential denial of a fundamental right of an accused and turns a "search for the truth" into an ill-advised game of "cat and mouse". To deprive the defendant of the right to interview witnesses for the state, except under unusual circumstances, places a high risk factor in favor of reversal of a verdict.

Unquestionably, when an accused faces the problem defense had in this case regarding the interviewing of witnesses, he should immediately make proper and timely application to the trial court to order such an interview. If the trial court deems the witness has evidence which is relevant and material to the case, he should order the interview. This rule, however, is subject to the witnesses' consent to the interview, without suggestion or coercion from prosecutorial authorities.

The most clear and concise rule on the subject is found at 23 C.J.S. Criminal Law § 958, at page 817:

"Accused and his counsel have the right to interview witnesses before the trial; and the state has no right to deny them access to a witness material to the defense, but a witness cannot be compelled to submit to such interview, and it is not the duty of the arresting officer or of the custodian of accused to procure witnesses for him. * * *

The court has a discretionary power to order the state to permit accused's counsel to interview a witness in its custody; and, when made in good faith, such an application should ordinarily be granted, particularly in a capital case. The denial of such an application is not error, however where no prejudice to accused is shown to have resulted."

Although the cases seem to make a distinction where a witness be in actual physical custody of the state, we feel the general rule is applicable even though the witness be not in custody.

■ Defendant's fourth and final assertion of error in the trial is the denial, by the trial court, of defendant's motion to acquit because of insufficiency of the evidence. Conceding the state's evidence was wholly circumstantial, Fields v. State, Okl. Cr., 284 P.2d 442, holds:

"The court or jury may convict one charged with crime where the evidence is circumstantial, * * * Mannon v. State, 68 Okl.Cr. 267, 98 P.2d 73; Ex parte Jefferies, 7 Okl.Cr. 544, 124 P. 924, 41 L.R.A.,N.S., 749.

Here on appeal, in considering the sufficiency of the evidence, we note the rule for guidance, and being that where the evidence against the defendant is wholly circumstantial, the circumstances proved must not only be consistent with each other, but consistent with the defendant's guilt, and inconsistent with any other reasonable hypothesis than his guilt. Hicks v. State, 70 Okl.Cr. 284, 106 P.2d 136; Fleetwood v. State, 95 Okl.Cr. 163, 241 P.2d 962; Wininegar v. State, 97 Okl.Cr. 64, 257 P.2d 526, 529. But contrariwise, this court has any number of times said:

'A conviction may be had on circumstantial evidence when all circumstances proven are consistent with each other and with hypothesis that defendant is guilty, and inconsistent with every other rational hypothesis.'

Wininegar v. State, supra, and cases cited.

There is a further principle that likewise must be kept in mind, and being that the findings of a jury on a disputed question of fact will not be disturbed on appeal where there is competent evidence in the record to sustain the jury's findings. Wininegar v. State, supra; Miller v. State, 92 Okl.Cr. 382, 223 P.2d 557; Sukovaty v. State, 94 Okl.Cr. 391, 236 P.2d 696; Odell v. State, 94 Okl.Cr. 159, 232 P.2d 158."

It is abundantly clear by a reading of the transcript as a whole, that the evidence in this case is totally inconsistent with defendant's innocence, and consistent with guilt. And, the evidence clearly established a fact question for the jury, which they determined adversely to defendant from competent evidence.

Under his final proposition of error, defendant argues the evidence of the State of Oklahoma to satisfy the law of proof required that the defendant was sane at the time of the commission of the crime is inadequate and had no probative value. Suffice it to say defendant had the opinion of an expert witness that at the time of the commission of the offense, defendant was insane, while the state offered rebuttal expert opinion that defendant was sane. This presented a fact issue for the jury. In Jones v. State, Okl.Cr., 479 P.2d 591, we held that on a murder prosecution, the question of insanity at the time of the commission of the crime, presents a question of fact for the sole determination of jury, and when there is any evidence tending to support the finding, it is not the province of the appellate court to weigh the same.

Having, therefore, carefully examined the entire record and briefs and finding no error, the judgment and sentence of the trial court is, in all respects, hereby affirmed.

BUSSEY, P. J., and BRETT, J., concur.