LeRoy DANIELS, Jr., Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–149.

Court of Criminal Appeals of Oklahoma.

Dec. 27, 1976.

Rehearing Denied Jan. 11, 1977.

Jim McClendon and Sandi McLendon, Legal Intern, Broken Bow, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Presiding Judge:

The appellant, LeRoy Daniels, Jr., hereinafter referred to as defendant, was charged in the District Court, McCurtain County, Case No. CRF–75–18, with the offense of Murder in the First Degree, in violation of 21 O.S.Supp.1973, § 701.1. He was tried by a jury and found guilty of the aforementioned crime. His sentence was that he should suffer death. From said judgment and sentence a timely appeal has been perfected to this Court.

The incident from which the charge arose took place on or about the 13th day of January, 1975. At the trial the first witness called by the State was Dan De-Berry. He testified that he went to the home of the deceased, Danny Ray, on the 16th day of January, 1975. He stated that

he discovered the body of decedent. He further testified that he went into the Ray home and it appeared to have been ransacked.

The State's next witness, Elmer Cook, testified that he accompanied Dan DeBerry to the scene of the crime, and he substantiated DeBerry's testimony.

The State then called Jim Coffman, an Oklahoma State Highway Patrol Trooper, to the stand. Officer Coffman testified that he arrived at the scene of the crime shortly after the crime had been reported. He stated that Sheriff Gilbreath and Mike DeBerry, Assistant District Attorney, were already at the scene. Coffman further testified that he found a knife blade and a radiator cap at the scene. The pockets of the decedent were turned inside out.

Next to testify for the State was Louis M. Shaw of the KEDDO Mobile Crime Lab, who stated that he was involved in the investigation of the instant crime on January 16, 1975. Shaw drew a sketch of the scene of the crime showing the relative position of the deceased's body, items of evidence found, and the buildings and structures at the scene. He also took pictures of the scene.

Another criminal investigator employed with the KEDDO Mobile Crime Lab, Gerald Brannan, next testified for the State. He assisted in the investigation of the crime and corroborated the testimony of Louis Shaw.

Mr. Shaw was then recalled to allow the State to introduce photographs, the sketch, and to establish a chain of custody for most of the State's physical evidence.

Carl Cloud, a firearms and tool-mark examiner for the Oklahoma State Bureau of Investigation, was the next witness. He testified that the knife blade found at the scene and a knife handle also found at the scene were portions of what was once one knife.

Merlyn Bellamy, M.D., pathologist and Assistant State Medical Examiner, testified that he performed an autopsy on the deceased and found that he had died of stab wounds inflicted in the right lower neck. Fragments of bone found at the scene were part of the decedent's jaw and were probably separated by a blow delivered by a blunt instrument. He also established that he drew blood samples from decedent's heart which were forwarded to the KEDDO Lab.

The State next called Ann G. Reed, a chemist for the Oklahoma State Bureau of Investigation. She analyzed stains on the knife and found that they were human bloodstains, and she was able to determine that the blood was type O. She then stated that she tested the samples of the deceased's blood and found it also to be type O.

The next witness called was Pete Watson, who testified that on January 15, 1975, the defendant turned his vehicle over to him in lieu of a debt owed Watson by the defendant.

The State then called Thad Bunn who testified that he bought the vehicle in question on the 18th day of January, 1975, and at that time it did not have a radiator cap.

An Idabel Police Officer, William Denison, testified to establish chain of custody of two billfolds found at the scene and the radiator cap. These items were admitted into evidence at this time.

Alma Faye Townsend was the next witness for the State. She testified that on January 13, 1975, the defendant in the company of Lonnie Graves and Frank Nelson came to her house, left for an indeterminate length of time and returned. She related that before they left one of the above mentioned persons asked a man named Joe Ivory if he wanted to go with them "to do a job." She stated that the defendant had a firearm in his possession. She also testified that upon their return one of the group said that he had stabbed someone, and the defendant stated he shot a dog. The trial court, on three occasions, allowed the State's witness to refresh her memory from her testimony at the pretrial

hearing, over various objections raised by the defense.

The State's next witness was Ethel Jewel Gray. She reinforced the testimony of Alma Fay Townsend and added that she heard the defendant say he had shot a dog and stabbed a man, and that the defendant placed his gun in Alma Faye Townsend's closet after returning to her house. She admitted on cross-examination that she was not positive which of the three men made the statements.

Ada Lee Harris, witness for the defense, was allowed to testify out of time because she would otherwise be unavailable. She testified that the State's witnesses, Alma Faye Townsend and Ethel Jewel Gray, were in the bedroom of Ms. Townsend's house watching television. She stated that the defendant, Lonnie Graves, and Frank Nelson were in the living room of said house and that conversations going on in the living room could be overheard by those in the bedroom.

The State then returned to its presentation, calling Samuel C. Sparks, an Oklahoma State Bureau of Investigation Agent. fendant on the 21st of January, 1975, in the course of investigating the death of He stated that he had interviewed the defendant Danny Ray. Agent Sparks testified that he talked with the defendant at approximately 2:30 p. m. on January 21, and that he read the defendant his Miranda warnings and then gave the defendant a waiver of rights form, which defendant signed. The defendant was released later that afternoon and the Idabel police asked defendant to return to the police station at about 10:00 p. m. Sparks testified that subsequent to the defendant's return to the Police Department he again read the defendant his rights and defendant gave him a statement at that time. Agent Sparks related that the defendant's statement was that the defendant and Lonnie Graves and Frank Nelson were drinking at the defendant's house. At that time, according to Sparks, the defendant said they discussed robbing an old man who lived out in the country.

Sparks then testified that the defendant told him they left and went to the old man's house, asked the old man for water for his radiator, put water in the radiator, and then Graves struck the old man and started kicking him, while the defendant went through the man's pockets. Sparks testified the defendant told him that they went through the old man's house looking for valuables and then left. The defendant admitted to Sparks that he took some money, but did not know how much.

The State then called L. D. Gilbreath, Sheriff of McCurtain County. Sheriff Gilbreath testified concerning the scene of the crime and confirmed the testimony of other witnesses of the State in matters relating to the crime scene. He stated that on January 22, 1975, at 6:35 p. m. after he read the defendant his rights and the defendant signed a card waiving those rights, he discussed the crime with the defendant. Sheriff Gilbreath said that as a result of their discussion the defendant told him that Lonnie Graves, Frank Nelson and himself drove to the old man's house, put water in their radiator, and beat, robbed and stabbed the old man, the defendant further stating that Graves had stabbed the victim.

Thereafter, the State rested and the defense presented the remainder of its witnesses.

The defendant testified that he, Lonnie Graves, and Frank Nelson went to Alma Faye Townsend's house in the early evening hours of January 13, 1975. He stated that they left her house, drove his pickup to Danny Ray's house, stepped out in front of the house and sounded the horn on the truck. He said that he was getting water for his radiator when Lonnie Graves took the defendant's shotgun from the pickup and pointed it at Danny Ray and asked him for his money. The defendant further stated that Graves then struck Danny Ray with the stock of the gun and that Ray fell as he attempted to flee. Thereupon defendant testified that he, the defendant, started going through Ray's pockets and that as he left, Graves "stomped" the old

man. The defendant stated that he went into the house and he and Graves searched the house for valuables. The defendant maintained that the decedent was still alive when the defendant returned to his pickup truck and that later Graves came out to the pickup. Defendant testified that Graves stopped by the decedent on the way back to the pickup. Defendant stated he had never seen, nor possessed, the knife which was purported to be the weapon used to inflict the mortal wounds to Danny Ray. The defendant testified that he did not have a conversation with anyone at Alma Faye Townsend's house in which he said he killed anyone or shot anything. The also testified that he did not have a radiator cap on his pickup prior to, after, or on the night in question. The defendant testified that Frank Nelson stayed out by the truck during the time of the robbery and assault and at all times thereafter.

The third witness for the defense was Frank Nelson. His testimony was substantially the same as that of the defendant. He testified that the defendant did strike the deceased. It is of consequence that this witness was granted partial immunity to testify and that he was later convicted of perjury in Case No. CRF–75–176, in the District Court of McCurtain County, State of Oklahoma.

After a verdict of guilty was returned by the jury, the defendant filed a motion for a new trial. This matter was heard on June 22, 1975. At that time the defense called a juror, Sidney Herndon, who was a member of the jury which convicted the defendant and sentenced him to death. The juror testified that his father, Sidney Johnson Herndon, was the victim of a homicide. The juror had failed to mention this fact in voir dire when asked specifically whether he or any of his family had ever been a victim of a violent crime. On hearing by the trial court, the juror testified that he had forgotten the incident, as he was only four years old at the time. He said it did not affect his deliberations. The court refused to admit the testimony

of a psychiatrist about this matter on August 29, 1975.

Defendant's first assignment of error is that the trial court erred in failing to dismiss said cause, after the original trial was continued and a mistrial declared, said failure amounting to a denial of the defendant's right to a speedy trial. The defense relies on 22 O.S.1971, § 812. This statute is not a speedy trial statute in that 22 O.S.1971, § 817, provides that a dismissal under Section 812 is not a bar to any other prosecution for the same offense. Further, the language in Section 812 affixes the time to be measured by "the next term of court in which the indictment or information is triable after it is filed, . . ." The defense cites *In re Gregory,* Okl.Cr., 309 P.2d 1083 (1957), and *Janaway v. State,* 83 Okl.Cr. 74, 173 P.2d 222 (1946). Both of these cases treat the statute when the term "term of court" had a statutory meaning.

This Court has recognized in *Broadway v. State,* Okl.Cr., 494 P.2d 331, 336 (1972), that:

" 'Terms of court,' used as a measure to determine if a defendant has received a speedy trial, were legally abolished. . . ."

The test for speedy trial has been set out in *Coggins v. Shumat,* Okl.Cr., 401 P.2d 995, 996 (1965), that:

"Generally speaking, a 'speedy trial' is one conducted according to prevailing rules, regulations, and proceedings of law free from arbitrary, vexatious and oppressive delays. The right does not require a trial immediately upon arrest, or the filing of an indictment or information; but requires that the trial be had as soon as reasonably possible, within the statutory requirements, without depriving the prosecution of a reasonable time to prepare for trial."

See also, *Hart v. State,* Okl.Cr., 535 P.2d 302, 305 (1975).

This Court adopted a more specific test in *State ex rel. Trusty v. Graham,* Okl.Cr.,

525 P.2d 1231, 1237 (1974), as being, "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."

The length of delay is closely related to the reason for delay, and in the instant case a delay of only a little over four months is not excessive when the reason for delay was a mistrial requested by defendant. It certainly does not fall into the category of an "arbitrary, vexatious and oppressive" delay. *Hart v. State,* supra. We therefore find no merit in this assignment of error.

The defendant's second assignment of error is that the trial court erred in failing to sustain the defendant's motion for new trial on grounds of misconduct of a juror. The defendant cites *Thompson v. State,* Okl.Cr., 519 P.2d 538 (1974), to this Court in support of this assignment of error.

There exists two major points of distinction. First, the case cited discusses the exclusion for cause of deputy sheriffs and this is a well settled point of law in Oklahoma. Secondly, the defense attorney requested the dismissal of the jurors for cause when it became known that they were deputy sheriffs during voir dire and before the jury was empaneled.

In the immediate case, the competency of the juror was not attacked until after the verdict had been rendered. In such cases there is a reluctance of the court to allow such attacks because of the potential disruptive consequences to the trial of criminal cases. This fear was expressed in *Brown v. United States,* 356 F.2d 230, 233 (10th Cir. 1966). The facts in *Brown v. United States,* were that one of the juror's brothers had been murdered some years earlier. The juror had been asked whether anyone in his "immediate family" had been the victim of a violent crime. There, the court held that the term "immediate family" was ambiguous and the defense should have clarified what was meant and should have defined the scope more closely. The court said that there was no non-disclosure by the juror and, therefore, no bias shown. *Brown v. United States,* supra, at 232.

Perhaps the most important considerations are that the juror Herndon was examined on voir dire as to any bias he might have and again at the hearing for new trial. At the hearing for new trial he testified that his father's death had not entered into his mind and did not affect his deliberation in any way. Due to the young age of the juror at the time of his father's death, the trial judge may well have believed the juror was not influenced and that fair deliberation was given. In *Henderson v. State,* 95 Okl.Cr. 342, 246 P.2d 393, 416 (1952), the Court said, in quoting from *Allen v. State,* 70 Okl.Cr. 143, 105 P. 2d 450 (1940):

" 'Granting a new trial in criminal prosecution for disqualification of juror, which was unknown to defendant until after rendition of verdict, is matter of judicial discretion.' "

*Henderson v. State,* supra, went on to quote from *Stouse v. State,* 6 Okl.Cr. 415, 119 P. 271 (1911), to say:

" 'As a general rule, a verdict will not be set aside for reasons that would be sufficient to disqualify a juror on a challenge for cause, which existed before the juror was sworn, but which was unknown to the accused until after the verdict, unless it appears from the whole case that the accused suffered injustice from the fact that the juror served in the case.' "

In *Wagers v. State,* Okl.Cr., 370 P.2d 567, 572 (1962), this Court said that an abuse of discretion by the trial court must be shown, and absent such a showing the finding will not be disturbed. It was pointed out that the trial judge was usually in a better position to determine the credibility of the juror.

Further, it has long been held that oral testimony of a juror may be used to refute alleged bias. *Stewart v. State,* 4 Okl.Cr. 564, 109 P. 243, 247 (1910). In the instant case the juror testified that he was able to fairly and competently weigh the

evidence and that he was not prejudiced by his father's homicidal death. The trial judge was fully within his discretion in finding no prejudice to the defendant. *Stewart v. State,* supra, shows that this is especially true where, as in the instant case, the defendant in testimony all but admits his guilt.

Considering the facts of the instant case, the trial court did not err in its finding that there was no bias of the juror, no prejudice to the defendant, and in denying the motion for new trial. We, therefore, find this assignment of error to be without merit.

■ The third assignment of error brought by the defendant is that the trial court erred in failing to give the defendant's requested instructions to the effect that if the jury were to find that the defendant had withdrawn from the place of the homicide prior to the fatal attack then they should find the defendant not guilty. We do not think that the defendant was entitled to such an instruction. While the law on abandonment of a crime is not developed at length in Oklahoma, it is established that it takes more than a change of mind to exonerate the defendant. 21 Am. Jur.2d, § 125. The law is well stated in *People v. King,* 30 Cal.App.2d 185, 85 P.2d 928, 939 (1938), where that court said:

> "[T]he responsibility of one who has counseled and advised the commission of a crime, or engaged in a criminal undertaking, does not cease, unless within time to prevent the commission of the contemplated act he has done everything practicable to prevent its consummation. It is not enough that he may have changed his mind, and tries when too late to avoid responsibility. He will be liable if he fails within time to let the other party know of his withdrawal, and does everything in his power to prevent the commission of the crime. . . ."
> (Citations omitted)

In essence, the defendant asks the same thing of the Court as did the appellant in *State v. Naples,* 51 Wash.2d 525, 319 P.2d 1096, 1098 (1958), where that court stated:

> "The appellant assigns as error the court's refusal to instruct the jury that one who withdraws his aid before the completion of a crime is absolved from liability as an aider and abettor and should be found not guilty.
>
> ". . . The instruction was not a correct statement of the law. . . ."

In this case we must agree with the trial court that the defendant was not entitled to this instruction. This must be the finding since the instruction does not accurately reflect the law in Oklahoma. There was evidence that the defendant had contemplated killing the decedent. At no time was there any evidence given that the defendant abandoned the scheme for armed robbery. The defendant was a principal in the crime. In *Wilson v. State,* Okl.Cr., 552 P.2d 1404, 1405, 1406 (1976), this Court held that:

> "Pursuant to our statutory scheme the parties to a crime have been classified as either principals or accessories. A principal is defined as one who directly commits the offense or aids and abets in its commission, not necessarily being present. An accessory is defined as one who has knowledge of a felony and aids the felon in avoiding or escaping arrest, trial, conviction or punishment. . . ." (Footnotes omitted)

The defendant, as a principal, did not withdraw from the crime.

Defendant's fourth assignment of error is that the court erred in giving instructions numbers 4, 10 and 15, for the reason that the statutes assessing the death penalty and defining murder are unconstitutional. These instructions effectively set out the provisions of 21 O.S.Supp.1973, § 701.1, and § 701.3. As we noted in *Riggs v. Branch,* Okl.Cr., 554 P.2d 823, 827 (1976), the United States Supreme Court has essentially held that our statutory scheme in reference to the death penalty, 21 O.S.

Supp.1973, § 701.3, is unconstitutional. The proper sentence as determined in *Riggs v. Branch,* supra, at 829, is life imprisonment.

■ There was no prejudice to the defendant in the instructions other than that of the sentence. As such, and upon modification of such sentence of death to life imprisonment we find the instructions were proper, and accurately reflected the law.

■ The defendant's fifth and sixth assignments of error are that the trial court erred in questioning prospective veniremen regarding the death penalty and in excusing certain veniremen for cause. The veniremen of which the defendant complains are those excused because they could not assess, or were unsure of their capability to assess, the death penalty. This Court has heretofore held that the competency of jurors is largely within the discretion of the trial judge. Further, in *Justus v. State,* Okl.Cr., 542 P.2d 598, 607 (1975), this Court held that the trial court should exclude for cause those from the jury who are unsure of their ability to assess the death penalty. Therefore, this assignment of error has no merit. See also, *Williams v. State,* Okl.Cr., 542 P.2d 554, 570 (1975).

■ In his seventh assignment of error defendant urges that the court erred in allowing a witness for the State to testify, who was not endorsed on the information. The defendant had a remedy for this at trial. If the defense attorney was surprised and if he needed an opportunity to prepare further testimony it was encumbent upon him to withdraw his announcement of ready for trial, and if necessary to file a motion for a postponement or continuance, wherein he set out the facts constituting such surprise and, failing this, the defense attorney waives any error which may have occurred. *Johnson v. State,* Okl.Cr., 487 P. 2d 362, 363 (1971).

■ The defendant's eighth assignment of error is that the trial court erred in admitting the diagram of the scene of the crime, such diagram having the work "murder" printed on it, into evidence. This Court must agree with the defendant that the writing of the word "murder" on the plat was both unnecessary and inappropriate. The defendant's contention that our finding in *Hildebrandt v. State,* Okl.Cr., 507 P.2d 1323, 1326 (1973), that "the trial courts will, in all future cases, remove the writings on the police photographs," should apply to the plats and diagrams in that only the evidentiary notations for which purposes they are admitted and introduced should be allowed to remain on the plats or diagrams. It was error to allow the plat into evidence with the word "murder" displayed on it, but in view of the overwhelming weight of the evidence we cannot find that the defendant was prejudiced by the entry. The writing was, at most, cumulative to testimony at trial and did not appear to have influenced the verdict. Such error was harmless. Title 20 O.S.1971, § 3001; *Massengale v. State,* Okl.Cr., 548 P.2d 656, 659 (1976).

The defendant's ninth assignment of error is that the trial court erred in allowing the State to question witnesses concerning prior inconsistent statements in an improper manner, and, after permitting such questions, in failing to limit the jury's consideration of the answers given by a proper instruction.

■ The witness Townsend, after either forgetting some prior testimony or attempting to be evasive, was allowed to review her prior testimony, and then testified in a manner consistent with her prior statements. From the record it is difficult to ascertain whether the prosecutor proceeded on the basis of a recollection refreshed or a hostile witness. As a recollection refreshed, the prosecutor might have allowed the witness to refresh her memory from the preliminary hearing transcript after she did not remember any conversation concerning "shooting a dog," after he had laid the proper predicate. On the other hand, the prosecutor may have claimed surprise and injury at what he may have perceived as an evasive answer.

At that point, the witness may have been shown her prior testimony and asked to explain it. Failing explanation, she could have been declared hostile and, after the proper predicate had been laid, the preliminary hearing testimony could have been used to impeach her. See, *United States v. Eaton,* 485 F.2d 102, 104, 105 (10th Cir. 1973), and *Weaver v. State,* Okl.Cr., 446 P.2d 64 (1968). Since the witness testified, after her memory was refreshed, consistent with her testimony at the preliminary hearing, no prior inconsistent statement existed and no instruction needed to be given.

The testimony of Frank Nelson, which the defense complains of as elicited by the State, came on cross-examination. The use of the prior statement was easily within the scope of cross-examination. It is apparent that the witness made inconsistent statements but when confronted he admitted making the prior statements and their veracity.

■ Where the defense is not satisfied with the instructions and wishes a particular instruction to be given, it is the affirmative duty of counsel for the defendant to prepare such instruction and present it to the court. The instructions do generally cover the area of credibility of witnesses. The record is void of any such request and therefore it was not prejudicial error to fail to give any instruction on the proper scope of inconsistent testimony in this case. *Moreau v. State,* Okl.Cr., 530 P.2d 1061 (1975).

■ The tenth assignment of error presented by the defendant is that the trial court erred in refusing to admit into evidence the deposition of a psychiatrist at the hearing on a motion for new trial. It was entirely within the discretion of the trial judge to deny the admission of the deposition of a psychiatrist into evidence, when the psychiatrist never interviewed the subject and only answered hypothetical questions. Such testimony is irrelevant, incompetent and immaterial when offered to show bias of a juror. This was new evidence and a motion for a new trial and the admission of any such evidence is within the discretion of the trial judge, and this Court will not overturn that decision unless it can be shown that such discretion was abused. *Carson v. State,* Okl.Cr., 529 P.2d 499, 509 (1974).

■ The eleventh assignment of error is that the trial court erred in failing to instruct the jury on first degree manslaughter. The record supports a premeditated design to kill the decedent and there is no evidence that the defendant did not aid and abet in the commission of the murder and robbery. In *Provo v. State,* Okl.Cr., 549 P.2d 354 (1976), this Court said that it was the duty of the trial court to determine as a matter of law whether or not an instruction on a lesser included offense was necessary. The record would support a finding that there was no justification for a lesser included offense.

For all the above and foregoing reasons, the conviction is *AFFIRMED* and the sentence is *MODIFIED* to life imprisonment at hard labor.

BUSSEY and BLISS, JJ., concur.